THE STATE OF NEW JERSEY v. RALPH COOPER, COLLIS
ENGLISH, McKINLEY FORREST, JOHN MacKENZIE,
JAMES H. THORPE AND HORACE WILSON, DEFEND-
ANTS-APPELLANTS.

Argued May 16, 1949—Decided June 30, 1949.

542

544

*Messrs. James S. Turp* and *Robert Queen* (*Mr. James A. Waldron,* attorney) argued the cause for the appellants John MacKenzie and Horace Wilson.

*Mr. Frank S. Katzenbach, III,* argued the cause for the appellant McKinley Forrest.

*Mr. O. John Rogge,* of the New York Bar (*Messrs. Clarence Talisman, Emanuel H. Bloch* and *William L. Patterson,* the latter two of the New York Bar, and *Mr. Earl B. Dickerson,* of the Illinois Bar, on the brief; *Mr. Solomon Golat,* attorney) argued the cause for the appellants Collis English, James H. Thorpe and Ralph Cooper.

*Mr. Mario H. Volpe,* County Prosecutor (*Mr. Frank H. Lawton,* First Assistant County Prosecutor, on the brief) argued the cause for the State.

The opinion of the court was delivered by

HEHER, J. All six appellants were sentenced to death upon a verdict of "guilty" rendered by a jury August 6, 1948, upon the trial of an indictment returned in the former Mercer Oyer and Terminer charging murder in the statutory form. *R. S.* 2:188–11. The accused sued out a writ of error from the old Court of Errors and Appeals, and also appealed; and the cause was brought on for argument before the new Supreme Court pursuant to article XI, section IV, paragraph 8 of the Constitution of 1947 and chapter 367 of the Session Laws of 1948.

The entire record of the proceedings had upon the trial was returned with the writ of error, pursuant to *R. S.* 2:195–16.

The case was tried and submitted to the jury on the theory of a homicide committed in the perpetration or attempted perpetration of a robbery.

The lethal attack was made on the morning of January 27, 1948, on the premises No. 213 North Broad Street, in the City of Trenton, where the victim, William Horner, and a woman reputed to be his wife, Elizabeth McGuire, conducted a second-hand furniture store. There were two rooms on the first floor of the store premises, each well filled with old furniture ceiling high. The floor of the rear room was two steps lower than the floor level of the room facing the sidewalk.

The putative wife testified that English, Forrest and Wilson entered the store, apparently together, but that English and Forrest told her that Wilson was not "with" them; that English and Forrest proceeded to the rear room, where the deceased Horner was; and that Wilson asked her to show him a stove, and, while so engaged, she was struck on the head by an instrument, and the blow rendered her unconscious or partially so, but she was finally able to go to the door and make outcry. The accused are all colored. About two minutes before the cry of distress, two colored men were seen leaving the Horner store, not hurriedly but slowly. The witness could not identify either of them among the accused. Horner was found lying unconscious on a mattress in the rear room. He had a compound cominuted fracture of the skull which the medical examiner said "might have been caused by a blunt instrument." A full soda water bottle lay on the floor nearby. The neck of a broken bottle of the same type and splintered glass were found at the point where the attack was made upon Mrs. Horner; and there was "blood on the floor" and "blood and some liquid material" on a cot nearby. There were strands of hair on "the jagged edge of the broken neck of the bottle," similar to Mrs. Horner's. Mrs. Horner saw none of the other defendants in the store on the day of the homicide. But she said that Cooper had called there the prior January 16th to inquire about a mattress; that English and Forrest came to the store on January 23rd, and asked to see a mattress, and that Forrest selected one and made a deposit of $2 with the deceased Horner as earnest, for which she gave him a receipt; and that English and Forrest returned on January 26th, and requested and received a return of the deposit, for which Forrest gave a receipt which a handwriting expert for the defense testified was not signed by him. The State contends that MacKenzie was a lookout stationed not far away, at the intersection of North Broad and Perry Streets. A neighborhood retailer of soda water testified that on the morning of the day of the homicide two colored men purchased and carried away two bottles of soda water, the containers being of the same type and size as the

bottles found in the Horner store; later on the witness said the purchase was made by one colored man. She did not identify any of the accused as the purchaser; nor was she asked if she could do so. There was. no testimony except Mrs. Horner's of the presence of any of the accused at the scene of the crime on the day of its commission. Cash in the total sum of $1,642 was found in Horner's trouser pockets after his removal to the hospital.

English was arrested February 6, 1948; Wilson, Cooper, Forrest and Thorpe were taken into custody the following day; and MacKenzie was apprehended early on the morning of February 11th. They were all arraigned later in the morning of February 11th. Meanwhile, they remained in custody. The arrests were made without a warrant. Wilson maintained his innocence throughout. What purport to be confessions of guilt made by all of the accused except Wilson were admitted in evidence. These purported confessions are challenged as involuntary and "wanting in due process."

The State offered the confessions as proof of the presence of all of the accused except MacKenzie in the Horner store on the morning of the day of the fatal attack, and of Mac-Kenzie's presence nearby as a lookout; also as evidence of the plan and purpose to rob. All the defendants set up an alibi.

## I.

■ The judge did not have jurisdiction to pronounce the sentence of death.

The verdict was "guilty" merely; and thus none of the accused was convicted of murder in the first degree. The return to the writ of error certifies that the accused were "found guilty in manner and form as they stand charged under the indictment and are guilty of murder in the first degree;" and that on the poll each juror affirmed his concurrence in that verdict. But, by an order made by the judge in the Mercer County Court on January 13, 1949, the return was amended to accord with the fact as entered in the clerk's

minutes, and so the verdict of the jury as to each of the accused is shown to be "guilty," without more.

■ One cannot be put to death for homicide unless there has been a verdict by a jury, after trial of the issue in the constitutional mode, establishing in a specific terms his guilt of murder in the first degree. This is a peremptory statutory direction. It is provided that murder perpetrated "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in perpetrating or attempting to perpetrate arson, burglary, rape, robbery or sodomy, shall be murder in the first degree; and all other kinds of murder shall be murder in the second degree; and the jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, designate by their verdict whether it be murder in the first degree or in the second degree." *R. S.* 2:138–2. And it is further provided that every person "convicted of murder in the first degree," his aiders, abettors, counselors and procurers, shall suffer death unless the jury shall "by its verdict, and as a part thereof, upon and after the consideration of all the evidence," recommend life imprisonment, in which event no greater punishment shall be imposed. *R. S.* 2:138–4. The accused may not plead guilty to an indictment for murder: a plea of *non vult* or *nolo contendere* is permissible, but the death sentence cannot be imposed on that plea. *R. S.* 2:138–3.

■ The State suggests that the provision for the designation of the degree of murder of which the accused has been found guilty is applicable only to "murder perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing," since murder committed in the perpetration or attempted perpetration of one of the enumerated felonies is murder of the first degree, even though the elements of deliberation and premeditation are wanting. But this would constitute a disregard of the plain letter and the indubitable reason and spirit of the statute. The power to exact the extreme penalty was not to be left to doubtful inference; the sentence of death could be

pronounced only upon the return of a verdict of guilty of murder of the first degree in certain and definite terms, unaccompanied by a recommendation of life imprisonment.

The indictment does not charge murder in the commission of a robbery. It does not specify the manner in which or the means by which the death of the victim was accomplished. In accordance with the statutory formula (*R. S.* 2:188–11), it charged murder without regard to degree or circumstance; and this sufficed. The offense of murder remained as it was at common law before the statute: the distinction of degree has reference to a difference in punishment. The most heinous are punishable by death or life imprisonment, as the jury shall determine; those wanting in the same degree of moral perversion, by punishment less severe. But it is of the very essence of the statutory procedure that the jury adjudge the degree of guilt and thereby the character of the punishment. *Graves v. State,* 45 *N. J. L.* 347 (*E. & A.* 1883). A killing which constitutes murder at common law or under the statute is presumed to be murder in the second degree; and the burden is laid upon the State to establish circumstances which would render it murder of the first degree under the statutory provision cited *supra*. *Brown v. State,* 62 *N. J. L.* 666, 669 (*E. & A.* 1899); *State v. Leo,* 80 *N. J. L.* 21 (*Sup. Ct.* 1910).

It is not a sufficient answer to say that the theory of the State was a killing in the perpetration or attempted perpetration of a robbery by the accused; and that this was the issue submitted to the jury for determination, and the alternative to acquittal under the charge was a conviction of murder in the first degree. First, the statute is imperative in its command that, if the accused be found guilty, the jury shall determine whether the offense be murder in the first degree or in the second degree; and secondly, we have no way of knowing from the verdict as rendered whether the issue of degree was even considered by the jury, much less determined. The accused is subject to the extreme penalty only in case there shall be a conviction of murder in the first degree in specific terms, unattended by a recommendation of life imprisonment;

and the infliction of the death penalty upon a mere verdict of "guilty" is wholly nugatory. It goes without saying that a verdict of "guilty" upon an indictment which simply charges "murder without regard to the degree" is not a verdict of guilty of murder in the first degree. A finding of circumstances constituting murder of the first degree is not to be annexed to a verdict of "guilty" by intendment or a presumption based upon the evidence. That is a solemn obligation of the jury in a matter of the utmost gravity; and its fulfillment cannot be made to rest on bare inference. The death sentence cannot be pronounced unless the verdict is definitive of the degree of guilt which entails that penalty. Not only is it understandable that the Legislature deemed it essential that in resolving an issue involving the death penalty or life imprisonment, the finding be specific and not left to conjecture; it is inconceivable that it would not have so provided.

This was the holding in the case of *State v. Turco,* 98 *N. J. L.* 61 (*Sup. Ct.* 1922). There, also, the evidence tended to show a killing in the commission of a robbery; and there, also, the jury were instructed that under the law the accused was either guilty of murder in the first degree or of no offense at all. There, too, the indictment was in the statutory form; and the conclusion was that the death sentence cannot be pronounced unless there is a specific finding by the jury of murder in the first degree. While that was not an adjudication of the court of last resort, it has ever since stood unchallenged; and the failure of the Legislature to exercise its amendatory power is significant of acquiescence in that interpretation. We consider that that case was soundly reasoned and decided. It is not a differentiating circumstance that the death sentence here was pronounced in the presence of the jury, immediately after the rendition of the verdict and before dispersal. The jury's silence did not constitute an amendment of the verdict, nor confer jurisdiction to pronounce the judgment of death.

And it is a corollary of the foregoing considerations that the failure of the accused, at the time of sentence, to question the sufficiency of the verdict, by motion in arrest of judg-

ment or otherwise, did not serve to confer upon the judge jurisdiction to impose the extreme penalty as for murder in the first degree. Compare *State v. O'Leary*, 110 *N. J. L.* 36 (*E. & A.* 1933).

## II.

The charge relating to the jury's function to determine the punishment upon a finding of murder in the first degree is assigned for error.

The jury were advised that if the killing was done in the perpetration or attempted perpetration of a robbery of the deceased Horner, as the result of a common purpose, the punishment would be death unless the jury "shall by its verdict and as a part thereof, upon and after the consideration of all the evidence, recommend" life imprisonment. And then came this instruction:

"There are no restrictions or limitations placed on the jury by law as to the reasons which may prompt such a recommendation. Ask yourselves then. the question: 'Are such defendant or defendants found to be guilty, if you so find, entitled to receive mercy at your hands or should they for any reasons of your own receive the extreme penalty of death?' What you are asked to do, and are bound by your duty to do, is to keep in mind your responsibility not only to do justice to the defendants, but also to remember your similar responsibility to the State in the administration of its criminal laws and the maintenance of law and order and in the detection and punishment of crime. You are charged with the most solemn duty that the law can impose upon you as citizens."

Thus, the jury were told that they were under "no restrictions or limitations * * * as to the reasons" for a recommendation of life imprisonment. The inquiry for the jury was stated to be whether the defendants, if found guity, were "entitled to receive mercy at your hands, or should * * * for any reasons of your own receive the extreme penalty of death?" In this, there was error.

The exercise of this statutory power to substitute life imprisonment for the death penalty is not governed by a specific standard; but it is requisite that action rest upon some con-

sideration arising out of the evidence. *State v. Deegan*, 132 *N. J. L.* 261 (*E. & A.* 1944); *Stale v. Giampielro*, 107 *N. J. L.* 120 (*E. & A.* 1930). So confined, the jury's discretion is absolute and uncontrolled. The exercise of the function is not restrained by any other rule. The statute makes no pretense of delineating the circumstances which in legislative contemplation would serve to mitigate the rigor of the death penalty. That question is committed to the judgment and conscience of the jury, guided by the evidence.

Under the original act of 1916 (*P. L., p.* 576, *c.* 270), the jury were at liberty but not bound to consider the evidence in determining whether to make or to refuse a recommendation of life imprisonment. It was a discretionary function whose exercise did not require "the support of evidence," for it was not "a finding of fact," and the trial judge was not justified "in suggesting to the jury the consideration of the character of the crime, as shown by the evidence produced on the question of the guilt or innocence of the accused, as a reason for withholding the recommendation;" and what was said by the judge to the jury to that end could not be "excused as a comment on the evidence," for the evidence had relation only to the issue of guilt or innocence and not to the recommendation permissible under the statute. *Stale v. Martin*, 92 *N. J. L.* 436 (*E. & A.* 1919). Chancellor Walker, in his dissent, expressed the view that, while a recommendation of life imprisonment was not a part of the verdict, and it was not the province of the judge "to influence the jury in making such a recommendation," that "discretion may properly be arrived at only by a consideration of the evidence." Then came the amendment of 1919 (*P. L., p.* 303, *c.* 134;. now *R. S.* 2:138–4), which provides the death penalty for murder in the first degree unless the jury shall "by their verdict, and as a part thereof, upon and after consideration of all the evidence," recommend life imprisonment. Unlike the pre-existing provision, the recommendation is made a constituent element of the verdict. Under the original statute, the jury were vested with an arbitrary discretion; under the amendment, the jury exercise judgment and discretion based upon the evidence.

As Mr. Justice Lloyd said in *State v. Giampietro, supra:*
"Trial judges should be on guard against the introduction
of other elements that might influence the making or with-
holding such recommendation."

Here, the instruction might well have resulted in the use
of considerations *dehors* the evidence as grounds for withhold-
ing the recommendation. We have no way of knowing that it
did not have such influence. It is not difficult to conceive
of extraneous factors that would have such effect when the
consideration of the jury is not confined to the evidence. The
prior reference to the specific terms of the statute touching the
jury's consideration of the evidence on this inquiry provides
no assurance that the jury understood the precise nature and
scope of its function in this regard, for the instructions are
contradictory, and the jury did not have the faculty of divin-
ing the true principle. *State v. Martin, supra; State v.
Clayton,* 83 *N. J. L.* 673 (*E. & A.* 1912).

## III.

. There was evidence tending to show that the soda water
bottle found in the rear room of the Horner store was tested
for fingerprints in the Identification Bureau of the Trenton
Police Department, and that the neck of the splintered bottle
discovered in the front room was given a like examination in
that Bureau and also in the State Police Identification Bureau.
The State offered no evidence in that regard; and the accused
directed *subpœna duces tecum* to the Director of Public Safety
of Trenton and certain of that department's superior officers
and to the supervisor of the State Police Identification Bureau.
On the State's motion, the subpœnas were quashed; and this
judicial action is also assigned for error.

The supervisor of the State Police Bureau of Identification,
Captain Sjostrom, responded to the subpœna and was sworn
as a witness for the defense. When counsel stated that his
purpose was to show "the nature and extent of the tests made
in the laboratory" of the State Police Identification Bureau
of "the unbroken and broken bottle," the State objected to

the inquiry on the ground that the State Police is a "governmental agency" and the record thus made at the instance of the State, acting through the prosecutor, was "confidential" and not "subject to subpœna," and moved that the subpœna be quashed. The judge concluded that the "investigation" made by the State Police Bureau "has a sort of a privilege," and the motion was granted. The prosecutor thereupon said that "if counsel wants all the records into evidence, we will consent now that all of the findings and all of the reports be offered into evidence;" and the court ruled that "if any portion goes in the rest must as well." Counsel objected to this course; and the ensuing colloquy reveals that the defense was precluded from showing the record of the fingerprint tests of the bottles and the receipt allegedly given by Forrest to the deceased Horner for the returned earnest money.

■■ The result of this examination of the bottles and the receipt was competent evidence relevant to the issue, and was admissible at the instance of the accused. There is no "privilege" known to the law which puts evidence of this class beyond the reach of the accused. The State is not at liberty to introduce such findings into evidence when it suits its purposes and plead "privilege" when the evidence is sought by the accused. The object of the trial of an indictment is to determine the guilt or innocence of the accused, by all available competent evidence relevant to the issue. A rule that would exclude such evidence when invoked by the accused would be contrary to elemental justice and wholly alien to our Anglo-American tradition, embodied in constitutional precepts, which insures the essentials of a fair trial before one can be condemned for crime. To this end, the Constitution secures to the accused the right "to have compulsory process for obtaining witnesses in his favor." *Constitution of 1844, article I, paragraph* 8; *Constitution of 1947, article I, paragraph* 10. There is not a fair trial when evidence substantially bearing upon the issue is suppressed or put beyond the reach of the accused.

■ With some few exceptions peculiar to the nature of criminal proceedings, such as the rule of corroboration in

perjury, the rule for *"corpus delicti,"* the rule for bigamous marriage, and the rule for a party's character, the rules of admissibility are in general the same for the trial of civil and criminal cases. "The general rules of evidence are the same in criminal and civil cases. What may be received in the one case, may be received in the other, and what is rejected in the one, ought to be rejected in the other." *West v. State,* 22 *N. J. L.* 212, 242 (*Sup. Ct.* 1849). There is no ground for a distinction in principle between the two classes of cases. The relation between an evidentiary fact and a particular proposition is ever the same; it does not vary because of· the kind of litigation in which the proposition is to be proved. We do not have "two systems of rules, distinct in history and in method, as was the case with the Chancery practice in general. There is but one system of rules for criminal and for civil trials." *Wigmore on Evidence* (3rd ed), § 4.

The witness here did not plead that, by reason of privilege, he was not legally compellable to produce the fingerprint records or to testify in respect of matters within his knowledge touching the fingerprint tests; nor would such a plea have ·validity. It was open to the accused, if they could, to show that the instruments in question did not bear their fingerprints or that they bore the fingerprints of others. Even where the production of the record is not compellable by reason of privilege or otherwise, the subject matter of the record is provable by the party who is in need of the evidence. In *Sayer v. Glossop,* 2 *Exch.* 409, Pollock, C. B., said: "As the person who has the legal custody of the register is not by law compellable to produce it, the party who stands in need of the evidence which that document affords is not to suffer from its absence at the trial. \* \* \* If in point of law you cannot compel a party who has the custody of a document to produce it, there is the same reason for admitting other evidence of its contents as if its production were physically impossible."

There is no privilege which puts beyond the reach of compulsory process evidence in the possession of police or

prosecuting authorities bearing upon the truth of the fact in issue in a criminal case. The suppression by this means of evidence upon which the innocence of the accused might depend would infringe his constitutional rights and offend again the plainest principles of justice and policy.

The allowance of the claimed privilege would savour of the one time refusal of the common law to allow the accused to produce any witness at all. As said by Carpenter, J., in *Daly v. Dimock*, 55 *Conn*. 579, 589 (1887), where an order was granted for the inspection of testimony taken at the coroner's inquest: "The law presumes every man to be innocent until the contrary appears; and its policy is to give every man accused of crime a reasonable opportunity to prepare and present to a jury his defense. The State does not desire to procure convictions by any unfair concealment or surprise. It concerns itself quite as much in having the innocent acquitted as in having the guilty convicted. While it affords every reasonable facility for the prosecution of offenders, it is no less solicitous to give to every accused person a fair and reasonable opportunity to make his defense."

The *subpœna duces tecum* addressed to the Director of Public Safety of Trenton and officers of the Police Department sought all documents, records, data, memoranda, reports, and "observations in anywise touching upon, with respect to, or regard to the aforementioned murder and investigation," and was therefore essentially exploratory and unreasonable and oppressive. The accused may have process to compel the attendance as witnesses of persons capable of giving evidence and the production of documents, papers and chattels material to the cause, though in the possession of a stranger. But the subject of a *subpœna duces tecum* must be specified with reasonable certainty, and there must be a substantial showing that they contain evidence relevant and material to the issue. If the specification is so broad and indefinite as to be oppressive and in excess of the demandant's necessities, the subpœna is not sustainable. *Wigmore on Evidence* (*3d ed.*), § 2200. This principle is embodied in *Rule* 2:5-8 of this court, providing for compulsory process

for the production of "books, papers, documents or other objects designated therein," even before the time of trial if the court shall so direct. The court is empowered to quash or modify the subpœna "if compliance would be unreasonable or oppressive." This rule is in substantial accord with the pre-existing practice in this State. See, in this connection, *People v. Gatti,* 4 *N. Y. S.* 2d 130.

## IV.

Now, as to the purported confessions:

The inculpatory statements ascribed to Cooper, English, Thorpe and Forrest were all made while they were in police custody, without the sanction of a warrant of arrest, and before arraignment and commitment; MacKenzie's, the day following his arraignment, which was had shortly after he was taken into custody.

The contention is that the confessions imputed to the first-named four were coerced and were therefore involuntary in fact; that they were elicited in an atmosphere proscribed by the Fourteenth Amendment of the Federal Constitution, while they were held incommunicado, without a warrant or arraignment, and under the pressure of constant interrogation for four or five days, without the advice of counsel or caution as to their "constitutional rights;" and that they are inadmissible for these reasons and also for non-compliance with *R. S.* 2:180B–2, requiring arraignment "without unnecessary delay," and *R. S.* 2:216–9, relating to detention without commitment. It is said that, in making the purported declarations, the confessors "yielded to time, physical and psychological exhaustion, and the weighted, overpowering authority of police officialdom." MacKenzie's confession is deemed inadmissible under the Fourteenth Amendment because taken while he was "illegally detained" by the police after he was ordered committed to the county jail, without prior notice "of his right to have counsel," and while he had a "lapse of consciousness" following the smoking of cigarettes provided by a turnkey.

A confession freely and voluntarily given, uninduced by either hope or fear or other consideration leading to the substitution of something else than the truth, is testimonially trustworthy and evidential where probative value alone is the measure of its worth; but under the Fourteenth Amendment conformance with the general testimonial principle of trustworthiness is not alone the criterion of admissibility. In the enforcement of the constitutional guaranty of due process, the inquiry is whether there has been observance of "that fundamental fairness essential to the very concept of justice. * * * The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false." *Lisenba v. People of State of California,* 314 *U. S.* 219 (1941), 62 *S. Ct.* 280, 86 *L. Ed.* 166.

There has been great controversy as to what, constitutes "fundamental unfairness" in the use of evidence. It cannot be doubted that a confession induced by physical or moral compulsion, whatever its nature, has no evidential efficacy. In the *Lisenba case, supra,* it was held that where a prisoner "held incommunicado is subjected to questioning by officers for long periods, and deprived of the advice of counsel" the record will be scrutinized "with care to determine whether, by the use of his confession, he is deprived of liberty or life through tyrannical or oppressive means," and "had so lost his freedom of action that the statements made were not his but were the result of the deprivation of his free choice to admit, to deny, or to refuse to answer." The inquiry was there resolved against the prisoner. But in each of three cases decided three days ago, the Federal Supreme Court found a denial of due process where, without more, there was prolonged interrogation of the accused over a period of several days, and the accused was under detention without a hearing contrary to state law requiring immediate arraignment, and "without friendly or professional aid and without advice as to his constitutional rights." Mr. Justice Frankfurter said: "A confession by which life becomes forfeit must be the expression of free choice. A statement to be voluntary of course

need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. * * * The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right. To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process. This is so because it violates the underlying principle in our enforcement of the criminal law. Ours is the accusatorial as opposed to the inquisitorial system. * * * The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights—these are all characteristics of the accusatorial system and manifestations of its demands. Protracted, systematic and uncontrolled subjection of an accused to interrogation by the police for the purpose of eliciting disclosures or confessions is subversive of the accusatorial system. It is the inquisitorial system without its safeguards. For while under that system the accused is subjected to judicial interrogation, he is protected by the disinterestedness of the judge in the presence of counsel." *Watts v. State of Indiana, No.* 610 October Term, 1948, 338 *U. S.* 49; *Turner v. Commonwealth of Pennsylvania,* No. 107 of the same Term, 338 *U. S.* 62; *Harris v. State of South Carolina,* No. 76 of the same Term, 338 *U. S.* 68.

In the case last cited, Mr. Justice Frankfurter said: "Petitioner was not informed of his rights under South Carolina

law, such as the right to secure a lawyer, the right to request a preliminary hearing, or the right to remain silent. No preliminary hearing was ever given and his confession does not even contain the usual statement that he was told that what he said might be used against him. During the whole period of interrogation he was denied the benefit of consultation with family and friends and was surrounded by as many as a dozen members of a dominant group in position of authority. It is relevant to note that Harris was an illiterate. * * * The systematic persistence of interrogation, the length of the periods of questioning, the failure to advise the petitioner of his rights, the absence of friends or disinterested persons, and the character of the defendant constitute a complex of circumstances which invokes the same considerations which compelled our decisions in *Watts v. State of Indiana, p.* 49, *ante,* and *Turner v. Commonwealth of Pennsylvania, p.* 62, *ante."*

██ ██ These are the *criteria* which determine the evidential competency of the confessions received in evidence here. The meaning of the due process clause of the Federal Constitution is the exclusive province of the supreme federal judicial authority. Our function is to order a new trial when the judgment is tainted with error. We can do no more than to direct the application of the standards of the cited cases to the case made on the retrial.

Confessions having the undoubted element of spontaneity are not within the compass of this case. We have no occasion to consider the probative quality of a volunteered confession while the confessor is in custody without arraignment.

The judgment is reversed and a *venire de novo* is awarded.

OLIPHANT, J. (Dissenting in part.) I am in accord with the majority opinion except in so far as it holds the verdict rendered by the jury was insufficient, the sentence illegal and the judge did not have jurisdiction to pronounce the sentence of death.

*R. S.* 2:138–2 defines the degrees of murder, designating those "perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated

killing, or which shall be committed in 'perpetrating or attempting to pertrate arson, burglary, rape, *robbery* or sodomy, *shall be murder in the first degree;* and all other kinds of murder shall be murder in the second degree; and the *jury* before whom any person indicted for murder shall be tried shall, *if they find such person guilty thereof designate by their verdict whether it be murder in the first degree or second degree."* (Italics supplied.)

Clearly it was not the legislative intention to require a jury to designate in its verdict the degree of murder when by clear, definite language it provided that a killing done in the perpetration of a robbery is murder in the first degree. There is an old maxim, true today, "The law commands not useless things; for useless things are folly." Neither does it require a futility or a nullity.

Where in the trial of an indictment for murder, the elements of willfulness, deliberateness and premeditation must be proven to raise it to one of first degree from the presumption that a killing which constitutes murder at common law is murder in the second degree the jury must by its verdict say whether those elements have been so proven, for unless the homicide is committed in perpetration, or attempting to perpetrate one of the felonies named in the statute the killing must be willful, deliberate and premeditated in order to render it murder in the first degree. *State v. Turco,* 98 *N. J. L.* 61 (*Sup. Ct.* 1922), citing *State v. Deliso,* 75 *Id.* 808 (*E. & A.* 1908). But in the absence of a plea of insanity the state of mind of a defendant is not in issue where a human being is killed in the perpetration of a robbery. *State v. Roach,* 119 *N. J. L.* 488 (*E. & A.* 1938).

It is said, the indictment here being in the statutory form, the jury could have returned either a first or second degree verdict. Not so. The theory of the case on the part of the State, acquiesced in by counsel for the defendants, and all of the State's proof was that the killing was done in the perpetration of a robbery while the defense was a complete denial. It was either statutory first degree murder or nothing. The court properly charged the defendants could be found guilty

of murder in the first degree, murder in the first degree with recommendation of life imprisonment or not guilty. There was no objection to this and such a charge has been approved many times. *State v. Roach, supra; State v. Gimbel,* 107 *N. J. L.* 235 (*E. & A.* 1930); *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.* 1935). In *State v. Giampietro,* 107 *N. J. L.* 120 (*E. & A.* 1930), it was held a request to charge in the following language: "Under this indictment for murder a defendant may be convicted of murder in the first degree, murder in the second degree, or manslaughter as the evidence may show" was properly refused. The court said: "The proofs were all to the effect that the killing was in an attempt to commit a robbery. There was no other alternative, and, that being true the section of the Crimes Act which makes a killing under such circumstances murder in the first degree, eliminated both second degree and manslaughter."

While *State v. Turco, supra,* appears to bear out the argument contained in the majority opinion that was not a pronouncement of the court of last resort and I am not inclined to follow it. That decision rested on the proposition that the indictment would have supported a verdict of second degree murder, entirely ignoring the statutory mandate making a killing done in the perpetration of a robbery murder in the first degree.

The verdict of "guilty" as returned by the jury was sufficient under the proofs, the charge of the court and the law to designate this murder as that of "first degree."

OLIPHANT, J., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD, BURLING and ACKERSON—6.

*For affirmance*—None.