STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. GEORGE TAYLOR, DEFENDANT-APPELLANT.

Argued March 20, 1967—Decided July 5, 1967.

442

444

*Mr. Warren Brody* argued the cause for defendant-appellant.

*Mr. Edmund J. Tucker,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Leo Kaplowitz,* Union County Prosecutor, attorney).

The opinion of the court was delivered by

FRANCIS, J. Murder indictments were returned against George Taylor, Richard Garner, Gerue Sullivan and Joseph Aiken charging them with the fatal shooting of Lester Drew on February 21, 1962 during an attempted robbery. Sullivan and Aiken pleaded *non vult,* and testified for the State against Taylor and Garner, who went to trial. The jury returned a verdict of murder in the first degree with a recommendation of life imprisonment against Taylor and Garner, and that sentence was imposed. Sullivan and Aiken were the active participants in the attempted hold-up, Sullivan doing the shooting. On their *non vult* pleas they too were given life imprisonment.

Shortly thereafter, Sullivan and Aiken, obviously disappointed with their sentences, recanted their confessions and their trial testimony, saying there had been no attempted robbery of Drew. Their new version of the killing was that they had visited Drew to collect a debt owed by him, and that a shooting fracas had been precipitated by him in the course of his refusal to pay the debt. They maintained also that Taylor and Garner had no part at all in the affair, that they had lied about the robbery and about the participation of

Taylor and Garner in it. The latter two defendants thereupon moved for a new trial. The motion was denied after a full hearing, the trial court holding that the attempted recantation was "a post-conviction fabrication, not worthy of any credibility."

Taylor and Garner appealed to this Court from their convictions and from the order denying a new trial. We affirmed the judgments. *State v. Sullivan*, 43 *N. J.* 209 (1964), *certiorari* denied 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed.* 2d 477 (1966).

I

Some time later Taylor instituted this post-conviction proceeding under *R. R.* 3:10A, seeking vacation of the judgment of conviction on the ground that he had been denied a fair trial. Numerous grounds were urged in support of the application. We find merit in only one of them, and conclude that the error is sufficiently egregious to require a new trial as to Taylor.

Taylor claims he was denied a fair trial because, prior to the trial, the assistant prosecutor who handled the prosecution promised Sullivan that he would recommend leniency to the court in the matter of his sentence if Sullivan would appear for the State and stand by and testify in accordance with his confession, which clearly implicated Taylor. (Sullivan's confession did not charge any guilty knowledge of or participation in the attempted robbery by Garner.) And Taylor contends that under circumstances appearing at the trial the assistant prosecutor was under a duty to reveal the promise so it could be considered by the jury in evaluating Sullivan's credibility. The point was hinted at on the original motion for a new trial and on the appeal. It was not developed in full measure at the new trial hearing, however, because of a situation over which this defendant had no control. The assistant prosecutor was not available as a witness in that proceeding; he had suffered a rather serious illness and either he could not appear or, at least, it seems to have been agreed

that existing health considerations made it unwise to call him. His health had been restored by the time this post-conviction proceeding was brought, and his testimony, which we consider crucial, was taken and became part of the record.

At the hearing on the motion for a new trial, and again in this proceeding, Sullivan said that he testified against Taylor and Garner because the assistant prosecutor had promised a light sentence—less than 15 years. The trial court obviously disbelieved that any such *specific* promise was made. See, *State v. Sullivan, supra,* 43 *N. J.,* at *pp.* 230–232. We agree that it is unlikely that a promise of a less-than-15 year sentence was made. We agree also that the proof adduced does not support the claim of such an agreement. But the issue does not turn on the need for a finding that Sullivan truthfully stated the exact nature of the sentence compact he made with the representative of the State. In our judgment the focal and decisive testimony came from the assistant prosecutor, and we base our determination on the arrangement he made with Sullivan on the matter of sentence, the substance of which follows.

There is evidence in the record that, for a considerable time prior to the date fixed for the trial of the four defendants, Sullivan and Aiken were interested in pleading *non vult.* It seems plain that for tactical reasons the State preferred to wait until the trial date was close at hand. We do not regard that course as objectionable in murder cases of this type, where frequently the State finds itself dependent in large measure upon the testimony of accomplices. Be that as it may, the record shows that, shortly before the trial date, Sullivan's attorney communicated with the assistant prosecutor and offered the *non vult* plea. The assistant prosecutor responded by asking if Sullivan would testify in accordance with the statement he gave to the police. Upon receiving an affirmative answer, he said he would arrange a conference on the matter. This was done. Two conferences followed and there is no doubt that at least one of them was held shortly before the trial began. Sullivan's attorney attended both conferences.

■ The discussion covered a number of aspects of the case, the plea and the possible sentence. Mention was made of the fact that the charge against Sullivan was first degree murder, and that if the jury found him guilty and did not recommend life imprisonment the penalty would be death. Sullivan was told that if the prosecutor agreed to recommend to the court acceptance of a plea of *non vult,* which recommendation would probably result in its acceptance, the death penalty would be out of the case; the maximum sentence then possible would be life imprisonment. The assistant prosecutor made clear that such a recommendation depended upon whether he would testify for the State against Taylor in accordance with his statement to the police, which he had said was the truth. The statement was discussed with Sullivan and he agreed to so testify. The assistant prosecutor then said:

"I told Mr. Sullivan that for his cooperation I would ask the court for consideration at the time of sentencing, calling to the Court's attention the fact that he had turned a State's witness and cooperated with the prosecutor's office and also saved the State the expense of a trial as far as Gerue Sullivan, that's what I told him."

He said also that he would recommend "leniency" to the court, and although he asserted there was no specific discussion about a sentence "lower than life imprisonment" he testified that in his opinion, if the court accepted his recommendation, "leniency" would mean a term of years; *i. e.,* less than life imprisonment. A fair reading of the testimony leads irresistibly to the conclusion that the assistant prosecutor intended to convey and did convey the impression to Sullivan that, if he kept his word and testified favorably for the State, the prosecutor would recommend a sentence of less than life imprisonment.

■ The assistant prosecutor's promise to or agreement with Sullivan with respect to his sentence brings us back to the original trial, and the State's duty to disclose the facts or to permit them to be disclosed to the jury. This Court has declared it to be proper for a defendant on trial to inquire on

cross-examination of an accomplice who is testifying for the State against him, as to whether he is doing so to curry favor in the matter of his own prosecution, or because of a promise or expectation of a lenient sentence for himself. Such matters go to the witness' interest in helping the State to achieve a conviction of the defendant on trial, and obviously are material to an evaluation of his credibility. *State v. Curcio,* 23 *N. J.* 521, 525–527 (1957); *State v. Spruill,* 16 *N. J.* 73, 78–81 (1954). Thus the State is under a duty when the matter is raised at trial not to conceal the existence of a promise of or agreement to recommend a specific sentence or leniency for an accomplice who is testifying for the State. Or, put affirmatively, it has the duty to disclose the arrangement when proper inquiry raises the question. See, *Brady v. State of Maryland,* 373 *U. S.* 83, 83 *S. Ct.* 1194, 10 *L. Ed. 2d* 215 (1963).

When Sullivan was on the witness stand at the original trial testifying for the State, the assistant prosecutor on direct examination established that he had entered a plea of *non vult* to the indictment against him. On cross-examination by Taylor's attorney, the following took place:

"Q. When did you plead non vult to the indictment for this murder?
A. October 15th.
Q. Was that the first day of this trial?
A. Yes, it were.
Q. Have you been sentenced yet?
A. No, I haven't.
Q. Do you have any idea what sentence you will receive?
A. No, I don't.
Q. Do you know what the maximum sentence will be?
A. Yes, I do.
Q. What is that?
THE WITNESS: Do I have to answer that, Judge?
THE COURT: Yes, sir.
THE ASSISTANT PROSECUTOR: I object to that, if your Honor please. I can't see how that is relevant, what the maximum will be.
THE COURT: I will allow it, overruled.
THE WITNESS: Well, the sentence can go up to life, I can get life.
By Mr. Brody:
Q. And do you understand that it may be less than that?
THE ASSISTANT PROSECUTOR: I object to that, if your Honor please, as to what he understands or hopes for. We all live in hope.

THE COURT: Sustained.

MR. BRODY: Well, I think it is very relevant to the credibility of this witness' testimony what he has in mind.

THE COURT: I gather you think it is relevant, Mr. Brody, because you asked the question. There has been an objection to it which has been sustained. Ask another question."

Unfortunately, defense counsel did not pursue the matter by specific inquiry as to whether any promise or agreement had been made by the assistant prosecutor respecting Sullivan's sentence or a recommendation for leniency with respect to it. Such questions undoubtedly would have been permitted. If the judge had been aware of what we *now* know as to the assistant prosecutor's promise to or agreement with Sullivan, undoubtedly he would have allowed the question as to whether Sullivan understood that the sentence "may be less than" life. In fact, before the jury was drawn and the trial began, when the judge was considering whether to accept the plea of *non vult,* he said to Sullivan:

"THE COURT: Do you understand that the sentence on such a charge, on such a plea, can be either life imprisonment or a sentence to a State prison for a term of not more than thirty years?

DEFENDANT SULLIVAN: Yes, sir."

Under the circumstances, the question put at the trial as to Sullivan's understanding should have been allowed. But on the first appeal we found no prejudicial error in that connection because of the strong charge given by the trial court as to the duty of the jury to scrutinize Sullivan's testimony closely to determine if he was influenced in giving it by the strong motive of hope of favor. He told the jury also that the fact that one who has admittedly participated in a criminal offense has turned State's evidence naturally affects injuriously the credibility given to his testimony.

If the information *now* before us as to the promise of a recommendation of leniency had been in the record on the first appeal, undoubtedly a reversal of the conviction as to Taylor would have followed. This is particularly so in view of the nature of the effort to cut off the inquiry as to whether

Sullivan understood his sentence "may be less than life." The assistant prosecutor objected to any answer which would show "what he understands or hopes for. We all live in hope." This was not a frank statement of the situation. The assistant prosecutor knew that he had promised to recommend leniency for Sullivan, which in his opinion meant a recommendation for a sentence of a term of years rather than for life. At that point in the case, the objection and comment transgressed the principle enunciated in *Brady v. State of Maryland, supra.*

We need not rest our review on the trial incident just described. A far more serious violation of the *Brady* principle occurred at a later and crucial juncture of the case. As has been noted, Sullivan was an important State witness against Taylor. Consequently, the jury evaluation of his credibility was of great moment. After the jurors had been deliberating for some time, they submitted two written questions to the court. In answering the one here pertinent the court said:

"Mr. Foreman, and ladies and gentlemen of the jury, the Court has received your note propounding two questions. There is some uncertainty in the Court's mind about one of the questions. I am going to answer both of them, and then I am going to make an inquiry to which I ask that only your Foreman respond in order that the Court may supplement its original answer to that question, if it determines in the light of that response by the Foreman that it is necessary.

The first question the Court has is:

'After having pleaded non vult is there any reason why Sullivan and Aiken should expect their testimony in this case to have any effect on their sentence?' Interpreting it as the Court does, the Court responds that it knows of no reason why Sullivan and Aiken should expect their testimony in this case to have any effect on their sentence.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Those are the Court's answers to your questions, but there is a possibility that on question number one the Court has misinterpreted the purport of your question, and I ask your Foreman whether or not there is any doubt in the minds of the jury on the manner in which it should evaluate the testimony of persons in the status of Sullivan and Aiken. Is there Mr. Foreman?"

(Obviously the judge was referring to the instructions he had given in his main charge as to their duty to scrutinize the testimony of Sullivan and Aiken closely to determine if it was influenced by a hope of reward on their own sentences.)

"THE FOREMAN : No, Sir. I think you answered it very well."

When the Court received the two questions from the jury, the plain indication was that the jurors were debating the credibility of Sullivan and Aiken. The attorneys for Taylor and Garner, as well as the assistant prosecutor, were present and their views were sought out of the presence of the jury on the one question relating to whether there was any reason why Sullivan and Aiken "should expect their testimony to have any effect on their sentence." Taylor's attorney asked the Court to repeat the portion of the main charge which had been based upon *State v. Spruill, supra,* pointing out that the jury's question "might very well be" the factor "that the whole verdict will depend upon." In response, the judge said that he was concerned about the phraseology of the question. He said "in effect they are asking the Court a direct question, saying, 'Mr. Judge, should Sullivan and Aiken expect their testimony in this case to have any effect on their sentence?' They don't indicate that there is any question in their minds about the law. They are saying to the Judge, 'Tell us, Judge, should they expect their testimony to have any effect on their sentence ?' "

The assistant prosecutor agreed with the Court that the question did not reveal any lack of understanding about the instruction that had been given as to the care that should be used in studying the accomplices' testimony. And he agreed there was no need to recharge the *Spruill* doctrine. Then he said :

"We are dealing here with a question that is outside the case. not inside the case. What they are asking has no place in this court. It is not part of the testimony or the evidence of this Court. They are asking 'should.' 'Should,' that's important, your Honor. If it were in this case or inside this case, then the Court would have to tell them to rely on their recollection. on their memory of the testimony, of the evidence, and that is all that this jury is to consider in this case, the testimony and the evidence and the charge of the Court as it applies to those facts that were presented through the testimony and through the evidence. If it's something outside the case, the Court has no power to instruct them, and we feel that there should not be any instruction to

this jury or any recharge to the jury, but that the jury should be told by your Honor that they have to rely on their recollection of the testimony and the evidence as it is presented in this Court and nothing more."

This argument prevailed and the Court answered the question as shown above.

We do not have the slightest doubt that, had the trial judge been informed that the State had promised or agreed to recommend leniency for Sullivan at the time of his sentence, he would not have answered the jury as he did. When the jury interrogation was presented the assistant prosecutor was under a duty to disclose the fact to the Court. His failure to do so and the argument he made to persuade the Court to give the limited answer which was given cannot be excused. No legitimate interest of the State was served by concealment of the very information the jury wished and which it was entitled to have. Since Sullivan's credibility was of prime importance to a successful prosecution of Taylor, if the jury had been apprised of the promise of the prosecutor to recommend leniency it might have concluded that Sullivan was willing to assist in placing Taylor in the electric chair in order to obtain favorable treatment for himself.

In *Napue v. People of State of Illinois,* 360 *U. S.* 264, 79 *S. Ct.* 1173, 3 *L. Ed.* 2d 1217 (1959), the principal witness for the state in the murder trial of the defendant had been sentenced previously to a prison term of 199 years for his part in the same murder. On examination by the assistant state's attorney, he testified he had received no promise of consideration in return for his testimony. The witness was asked:

"Q. Have I promised you that I would recommend any reduction of sentence to anybody?
A. You did not."

In the post-conviction proceeding the assistant state's attorney's testimony was somewhat equivocal, as it is in the pres-

ent case, but the conclusion fairly to be drawn from it was that he had in fact promised the witness consideration looking toward a reduction in his sentence, in return for his testimony. Yet the state's attorney did nothing at the trial of Napue to correct the witness' false testimony.

The United States Supreme Court reversed the conviction, holding that the state's failure to correct the witness' misstatement denied Napue a fair trial in violation of the due process clause of the Fourteenth Amendment to the Federal Constitution. The Court said:

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." 360 U. S. at 269, 79 S. Ct. at 1177.

We see no substantial distinction between the failure of the state's attorney in the *Napue* case to correct the witness' statement, which he knew personally was not true, and the affirmative concealment by the assistant prosecutor here of the promise made by him to recommend leniency for Sullivan in return for his testimony. The language of Chief Justice Warren is equally applicable to our case:

"Had the jury been apprised of the true facts, however, it might well have concluded that Hamer had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer was testifying, for Hamer might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration." 360 *U. S.* at 270, 79 S. Ct. at 1177.

The Court of Appeals of New York was presented with a similar situation. In *People v. Savvides,* 1 *N. Y. 2d* 554, 154 *N. Y. S. 2d* 885, 136 *N. E. 2d* 853 (1956), it appeared that one Mantzinos was apprehended while picking up a quantity

of marijuana from a locker in a New York City bus terminal. He implicated Savvides as the person from whom he obtained the drug. Mantzinos pleaded guilty to the charge of felonious possession with intent to sell, which carried a mandatory minimum sentence. At the time of plea the assistant district attorney advised the court that the plea was taken with the "understanding" that, upon Mantzinos' "continued, truthful cooperation" the district attorney would "permit" him to withdraw it and plead guilty to a lesser crime which carried no mandatory minimum. At Savvides' trial the state produced incriminating testimony by Mantzinos. The court and the jury were not informed of Mantzinos' understanding with the district attorney. In addition, the witness actually denied that he expected "any consideration" in return for his testimony. The trial assistant district attorney was the one who had made the arrangement with Mantzinos, but he remained silent.

After conviction, defendant learned of the agreement and moved for a new trial. The Court of Appeals reversed the trial court's refusal to vacate the judgment, and ordered a new trial. Judge Fuld said:

"The conviction cannot stand. The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach. The prosecutor should have corrected the trial testimony given by Mantzinos and the impression it created. He should have, by immediate statement of his own or by further appropriate examination of Mantzinos, forthrightly exposed the lie, so that the court and jury would have known that the witness had reason to expect lenient treatment for 'continued * * * co-operation.' His failure to do so constitutes 'error so fundamental, so substantial,' that a verdict of guilt will not be permitted to stand.

\* \* \* \* \* \* \* \*

That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." 154 N. Y. S. 2d at 887, 136 *N. E.* 2d at 854–855.

 So far as the present case is concerned, the impact on the issue of Taylor's guilt or innocence was probably greater than in the *Napue* and *Savvides* cases. It was obvious from

the jury's question that its members were deeply concerned with the issue of Sullivan's and Aiken's credibility. The assistant prosecutor had within his personal knowledge the precise information they were seeking. Yet he not only kept silent but he persuaded the court to answer in the limited fashion it did, because the information was "outside the case." Such suppression prejudicially interfered with Taylor's right to a fair trial. See, *State v. Tate,* 47 *N. J.* 352, 356 (1966).

It should be pointed out here that there is nothing unholy in honest plea bargaining between the prosecutor and defendant and his attorney in criminal cases. At times, it is decidedly in the public interest, for otherwise, on occasion the guilty would probably go free. This does not mean that the prosecutor can commit the sentencing judge to any particular sentence or action, such as downgrading charges against the defendant or suspending sentence or granting probation. The prosecutor's function in this connection is strictly limited to an agreement to recommend a form of leniency, to which recommendation the court in its discretion after being made aware of the full situation would give due consideration. As noted in *The Challenge of Crime in a Free Society,* a report by the President's Commission on Law Enforcement and Administration of Justice (1967),

"The negotiated plea serves important functions. * * * It is frequently called upon to serve important law enforcement needs by agreements through which leniency is exchanged for information, assistance, and testimony about other serious offenders." *Page* 135.

In connection with such pleas, the Commission recommended:

"If a negotiated agreement to plead guilty is reached, care should be taken by prosecutor and defense counsel to state explicitly all its terms." *Page* 136.

See also, *Tentative Draft of Standards Relating to Pleas of Guilty* (1967), issued by the American Bar Association Project on Minimum Standards for Criminal Justice, *Section* 1.8 (a) (v).

When pleas are negotiated, the important purposes to be served are fairness to the pleading defendant and

to the public, and where one consideration for the plea is an agreement by a codefendant to testify truthfully for the state against another defendant, in return for a recommendation of leniency by the prosecutor, such promise or understanding should be fully, fairly and honestly disclosed when it comes into question at the trial. In the present case that was not done, and the failure to disclose the promise to recommend leniency infringed on Taylor's right to a fair trial. Accordingly his conviction cannot stand. It is reversed and the cause remanded for a new trial.

## II

Other assignments of error were made part of the post-conviction proceedings. We find no merit in any of them and affirm the trial court's disposition of them.

## III

The trial court allowed Taylor's attorney a fee of $350 for extensive work done in connection with this post-conviction proceeding. The complaint is made that the allowance is inadequate. Our examination of the record and the affidavit of services satisfies us that the complaint is just. Therefore we direct that the fee be increased to $600. Moreover, the attorney's affidavit reveals that he actually paid $250 for a particular stenographic transcript. Without detailing the nature of the transcript, except to say that it did not cover trial testimony, we disapprove of a daily copy rate for such work, and assume that it will not be repeated. In this isolated instance, however, since the expenditure has already been made by counsel, we will allow the full bill of $250 instead of the $125 approved by the trial court.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.