124 N.J. Super. 276 (1973)
306 A.2d 469
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JULIUS BLUE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 24, 1973.
Supplemental memoranda submitted May 23 and June 4, 1973.
Decided June 21, 1973.
*278 Before Judges KOLOVSKY, MATTHEWS and CRAHAY.
Miss Rita L. Bender, designated counsel, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Michael R. Perle, Deputy Attorney General, argued the cause for respondent (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
*279 The opinion of the court was delivered by KOLOVSKY, P.J.A.D.
Defendant, who had been employed as a guard at the Monmouth County Jail, was brought to trial on September 15, 1971 before Judge Conklin and a jury on a two-count indictment charging that he had, on or about October 30, 1970: (1) stolen three revolvers belonging to the Monmouth County Jail, in violation of N.J.S.A. 2A:119-2, and (2) received such revolvers, knowing them to have been stolen, in violation of N.J.S.A. 2A:139-1. The jury found defendant guilty of receiving stolen property and not guilty of larceny. Defendant's motion for a new trial was denied.
Defendant was sentenced to an indeterminate term to the Youth Correctional Institution Complex, with sentence suspended and probation imposed for a period of two years. The court further ordered him to pay a fine of $200 plus the costs of prosecution, payable during the probation period. (It should be noted that under State v. Mulvaney, 61 N.J. 202 (1972), decided after defendant was sentenced, the court was not authorized to require defendant to pay the costs of prosecution.) Defendant appeals.
Sometime during the weekend of October 30 to November 1, 1970 three revolvers were stolen from the gun room of the Monmouth County Jail. On December 3, 1970 Detective Kubaitis of Wall Township, responding to a report of an armed robbery, apprehended a man answering the description of the robber. The man, John Breeland, who was under the influence of narcotics, was found to be carrying a .38-caliber revolver bearing serial number 424211. According to Kubaitis, a teletype to a national information center revealed no information with respect to the revolver, but the next day, December 4, he talked to Breeland and "he told me that this weapon came from the Monmouth County Jail and he knew the subject who gave it to him but he did not wish to talk to me about this weapon at that particular time." Kubaitis then called the county jail and learned that the weapon was one which had been stolen from the jail.
*280 Almost five months later, on April 28, 1971, Breeland for the first time revealed the name of the person from whom he had allegedly obtained the revolver. In a written statement given that day to prosecutor's Detective Manning he said that he had obtained the revolver from defendant Blue.
The testimony of the State's witnesses other than Breeland indicated only that defendant had the opportunity to enter the gun room and remove revolvers therefrom. Breeland was the principal and critical witness against defendant.
Breeland, who had been in Rahway State Prison since January 1971 following revocation of his prior parole, began his direct testimony with a recital of his formidable prior criminal record and then told of his arrest by Detective Kubaitis. He didn't remember talking to the detective about the weapon which was found on him.
According to Breeland, sometime in the middle of November 1970 defendant Blue, with whom he was acquainted, approached him on the street in Asbury Park, carrying a brown paper bag, and asked whether he was "interested in some pistols." Breeland was interested. He and Blue went around the corner and Blue showed him three pistols, asking $40 apiece for them. Blue told him that the pistols "were taken from the County Jail," where he worked, explaining that "officers go out and take inmates sometimes, sometimes they take them to institutions or hospitals. They take weapons, supposed to be signed out. But it would not be signed out, therefore, they would have to be returned." Breeland was given one revolver and promised to pay $40 for it, a promise which, according to Breeland, "was nothing but empty words" since he capitalized on his "nickel and dime reputation in Asbury Park" which caused people to fear him.
Breeland also testified on direct examination that he had been questioned from time to time by prosecutor's detectives but had not revealed Blue's name until he gave the written statement of April 28, 1971. His direct testimony continued with the following questions and answers:
*281 Q. Let me ask you this: You have already been sentenced?
A. Yes.
Q. Did anybody make any promises to you? Did anybody make any deals with you in order to get you to reveal the name of the person who supplied the weapon you used in the robbery?
A. No. * * *
Breeland supplemented the last answer by describing a deal he had tried to make during the course of interrogations by the detectives which took place during the months prior to April 28, 1971.
During those interrogations, the detectives also sought to obtain information as to the whereabouts of the other two revolvers. Noting "how bad they wanted the pistols," Breeland sought "to make a deal with Captain Manning" of the prosecutor's staff, saying that if he were put "on the streets" for 30 days and promised a sentence of not more "than two to three at State's Prison," he would get the two pistols. He didn't "get that deal"; the police obtained the other two pistols through someone else.
On cross-examination, in response to a suggestion by defense counsel that the statement of April 28, 1971 had been given as part of a "deal" involving Breeland's pleas of guilty to charges against him, Breeland answered, "There was no deal."
On redirect examination, Breeland explained that he had no "animosity or ill will" toward defendant but was testifying only because [defendant] is nothing to me but a cop * * *. If he had been anything other than a cop I wouldn't be here."
Defendant testified and denied involvement with the theft of the revolvers or the delivery of one of them to Breeland. Other witnesses testified as to his good reputation and in support of his contention that he had never been in charge of the gun room.
Recognizing that impeachment of Breeland's credibility was essential to defendant's case, defense counsel then called as a witness the probation officer who had interviewed Breeland *282 in the course of his preparation of the presentence report which had been submitted to Judge McGowan who had sentenced Breeland.
Judge McGowan had permitted Blue's attorney to see Breeland's presentence report. Blue's attorney sought to prove, through the probation officer, that Breeland had made statements contradictory to his trial testimony  most significantly, that Breeland had told the probation officer that there had been a "deal" between him and the prosecutor, who had agreed to make a recommendation as to the sentence to be imposed on Breeland.
It is clear that defendant Blue had the right to seek to establish that Breeland's testimony was motivated by a desire to curry favor with the police and prosecuting authorities. As the court said in State v. Taylor, 49 N.J. 440 (1967):
This Court has declared it to be proper for a defendant on trial to inquire on cross-examination of an accomplice who is testifying for the State against him, as to whether he is doing so to curry favor in the matter of his own prosecution, or because of a promise or expectation of a lenient sentence for himself. Such matters go to the witness' interest in helping the State to achieve a conviction of the defendant on trial, and obviously are material to an evaluation of his credibility. State v. Curcio, 23 N.J. 521, 525-527 (1957); State v. Spruill, 16 N.J. 73, 78-81 (1954). Thus the State is under a duty when the matter is raised at trial not to conceal the existence of a promise of or agreement to recommend a specific sentence or leniency for an accomplice who is testifying for the State. Or, put affirmatively, it has the duty to disclose the arrangement when proper inquiry raises the question. See, Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963). [at 447-448]
Although obviously cognizant of this rule, the court sustained the prosecutor's objection and refused to permit the probation officer to testify, ruling that "the probation file is privileged."
The ruling was erroneous. Presentence reports prepared pursuant to R. 3:21-2 are not "a matter of public record," State v. DeGeorge, 113 N.J. Super. 542, 544 (App. Div. 1971), and normally should not be disclosed to anyone *283 other than the court and counsel for the defendant to which it refers. Nevertheless, neither the cases nor any statute recognize the existence of a privilege which would foreclose a probation officer from testifying, as here, that statements made to him by Breeland contradicted what Breeland had testified to at the trial.
On the contrary, absent a privilege created by statute or case law, the confidentiality of the presentence report must yield to the right of a defendant to produce evidence in the hands of the state authorities bearing upon the truth of the issues involved in his case. State v. Cooper, 2 N.J. 540, 555-556 (1949); see also, Lakewood Trust Co. v. Fidelity and Deposit Co., 81 N.J. Super. 329, 341 (Law Div. 1963); cf. Evidence Rule 36; State v. Oliver, 50 N.J. 39 (1967).
Moreover, even if the trial court's ruling on the issue of privilege were correct, still there must be a reversal because of the State's failure to reveal that in fact it had agreed with Breeland to recommend, and had recommended, a specific sentence in return for his promise to give a statement and to testify for the State. State v. Taylor, supra, 49 N.J. at 448.
Indeed, unless the assistant prosecutor who tried this case  and who had not been present either when Breeland pleaded or when he was sentenced  had not been made aware of what transpired at those times, he went beyond mere failure to disclose (1) when he elicited, on direct examination of Breeland, a negative answer to his question,
Did anybody make any promises to you? Did anybody make any deals with you in order to get you to reveal the name of the person who supplied the weapon you used in the robbery?
and (2) when he told the jury in summation that there were no deals, emphasizing that Breeland had already been sentenced before he testified and hence had nothing to gain by his testimony.
*284 Subsequent to oral argument we asked for and were furnished transcripts of the sentencing proceedings of September 3, 1971 before Judge McGowan and of the prior proceedings of April 27, 1971 before Judge Yaccarino, at which Breeland, pursuant to a plea bargain, retracted his prior pleas of not guilty and pleaded guilty to the first counts of Indictments 398-70, 490-70 and 564-70. These counts respectively charged him with carrying a weapon without a permit, robbery and possession of cocaine.
The proceedings before Judge Yaccarino opened with a statement by an assistant prosecutor outlining the counts to which Breeland proposed to plead guilty and advising the court that the State would move at the time of sentence to dismiss the other counts of the indictments.
The prosecutor's statement then continued:
As to sentencing, the State will recommend that any sentence the defendant receives in all three matters not be greater than six years nor less than four years, such sentences to be served consecutive with the sentence he is now serving but concurrent with the sentences which he will receive today in these three matters.

* * * * *
The State is stating this because it anticipates the cooperation from Mr. Breeland on other matters in our office, on other matters before the Court.
The State's anticipation of "cooperation from Mr. Breeland" was speedily realized, for it was the very next day, April 28, 1971, that Breeland gave a written statement to the prosecutor's detective, and for the first time named defendant Blue as the person who had given him the revolver.
At the time of sentence Breeland's attorney noted that Breeland had "cooperated in other areas with the Monmouth County Prosecutor's office" and that "through his efforts certain other people were brought to justice." The court followed the prosecutor's recommendations and imposed concurrent sentences whose effective total was four to six years, consecutive to the sentence Breeland was then serving. Further, in accordance with its agreement, the State moved for *285 dismissal of the remaining counts of the indictments against Breeland.
There is no substance in the State's suggestion that there was no duty to disclose the plea bargain, and in any event no prejudicial error because Breeland, having already been sentenced, had "nothing more to gain" by testifying for the State.
Nor is the State's failure to comply with its duty to be excused or ignored because defense counsel  who unsuccessfully argued on his motion for a new trial that there should be a hearing to determine whether Breeland had made a deal with the prosecuting authorities  had failed to produce, at the trial, what the State, in its supplemental memorandum, labels the "best evidence," viz., the transcript of Breeland's plea and sentence hearings. Cf. State v. Vigliano, 50 N.J. 51, 60 (1967).
The judgment of conviction is reversed and the cause remanded for a new trial.