78 N.J. 259 (1978)
394 A.2d 330
IN THE MATTER OF MYRON FARBER AND THE NEW YORK TIMES COMPANY, CHARGED WITH CONTEMPT OF COURT, DEFENDANTS-APPELLANTS.
STATE OF NEW JERSEY, PLAINTIFF,
v.
MARIO E. JASCALEVICH, DEFENDANT.
The Supreme Court of New Jersey.
Argued September 5, 1978.
Decided September 21, 1978.
*262 Mr. Floyd Abrams of the New York Bar argued the cause for appellants Myron Farber and The New York Times Company (Messrs. Winne, Banta, Rizzi and Harrington, attorneys; Mr. Peter G. Banta, Mr. Donald A. Klein, and Messrs. Cahill, Gordon and Reindel of the New York Bar, of counsel; Mr. Raymond L. Falls, Jr., Mr. Eugene Scheiman, Mr. Kenneth M. Vittor, and Ms. Faith Wender, members of the New York Bar, on the brief).
Mr. Dan Paul of the Florida Bar argued the cause for amici curiae The Miami Herald Publishing Co., The Washing Post Company, National Broadcasting Company, Inc., Times Mirror Company, The Philadelphia Inquirer, Scripps-Howard Newspapers, United Press International, Inc., Associated Press, Gannett Co., Inc., Newhouse News Service, Educational Broadcasting Corporation, The Chicago Sun Times, The Courier-Journal and Louisville Times Company, Dow Jones & Company, Inc., The American Society of Newspaper Editors, Radio Television News Directors Association, The National Association of Broadcasters, The Reporters Committee for Freedom of the Press, National Newspaper Association, The Florida Times Union and Jacksonville Journal, The Daily Sentinel, Star-Ledger, The Jersey Journal, CBS, Inc., American Broadcasting Companies, Inc., The Anniston Star, The New Jersey Press Association, Trenton Times, Minneapolis Star and Tribune Company, The Bergen Evening Record Corporation, The Des Moines Register and Tribune Company, Newsweek, The Newspaper Guild and The Newspaper Guild of New York, Local 3 (Messrs. Mazer, Lesemann and Rupp, attorneys; Messrs. Paul & Thomson of *263 the Florida Bar, of counsel; Mr. Arthur J. Lesemann, on the brief).
Mr. John J. Degnan, Attorney General of New Jersey, argued the cause for appellant, pro se (Mr. Degnan, attorney; Mr. Degnan and Deputy Attorneys General John De Cicco, Edwin H. Stern, Anthony J. Parrillo and Ileana Saros, of counsel and on the brief).
Mr. Raymond A. Brown argued the cause for respondent Mario E. Jascalevich (Messrs. Brown, Vogelman and Brown, attorneys; Mr. Brown and Mr. Henry F. Furst on the brief).
Ms. Edith S. Rose submitted a brief on behalf of amicus curiae Association of American Publishers, Inc.; (Messrs. Smith, Cook, Lambert and Miller, attorneys; Mr. Henry R. Kaufman, of the New York Bar, of counsel and on the brief).
Mr. Thomas C. Jamieson, Jr., submitted a brief on behalf of amicus curiae American Newspaper Publishers Association (Messrs. Jamieson, McCardell, Moore, Peskin and Spicer, attorneys; Messrs. Hanson, O'Brien, Birney & Butler, of the District of Columbia Bar, of counsel; Mr. Arthur B. Hanson and Mr. Mitchell W. Dale, members of the District of Columbia Bar, on the brief).
The opinion of the court was delivered by MOUNTAIN, J.
In these consolidated appeals The New York Times Company and Myron Farber, a reporter employed by the newspaper, challenge judgments entered against them in two related matters  one a proceeding in aid of a litigant (civil contempt), the other for criminal contempt of court. The proceedings were instituted in an ongoing murder trial now in its seventh month, as a result of the appellants' failure to comply with two subpoenas duces tecum, directing them to produce certain documents and materials *264 compiled by one or both of these appellants in the course of Farber's investigative reporting of certain allegedly criminal activities. Farber's investigations and reporting are said to have contributed largely to the indictment and prosecution of Dr. Mario E. Jascalevich for murder. Appellants moved unsuccessfully before Judge William J. Arnold, the trial judge in State v. Jascalevich, to quash the two subpoenas; an order was entered directing that the subpoenaed material be produced for in camera inspection by the court. The appellants' applications for a stay of Judge Arnold's order were denied successively by the Appellate Division of the Superior Court, by this Court, and by two separate Justices of the Supreme Court of the United States.
Impelled by appellants' persistent refusal to produce the subpoenaed materials for in camera inspection, Judge Arnold issued an order returnable before Judge Theodore W. Trautwein, directing appellants to show cause why they should not be deemed in contempt of court. During the subsequent hearing, Judge Trautwein ordered counsel for Jascalevich to apply to Judge Arnold, pursuant to R. 1:10-5, for an additional order to show cause, this to be in aid of litigants' rights. The order was issued, served and the hearing on the matter consolidated with the hearing on the criminal contempt charge.
Judge Trautwein determined that both appellants had wilfully contemned Judge Arnold's order directing that materials be produced for in camera inspection and found them guilty as charged. A fine of $100,000 was imposed on The New York Times and Farber was ordered to serve six months in the Bergen County jail and to pay a fine of $1,000. Additionally, in order to compel production of the materials subpoenaed on behalf of Jascalevich, a fine of $5,000 per day for every day that elapsed until compliance with Judge Arnold's order was imposed upon The Times; Farber was fined $1,000 and sentenced to confinement in the county jail until he complied with the order.
*265 The Appellate Division granted a stay of the contempt orders but denied a stay of the orders for relief of a litigant. Appellants' initial motion for direct certification to this Court was denied. The Attorney General, designated by the Court to prosecute the contempt charges against the appellants, moved before the Appellate Division for a remand in order that the trial court might determine whether the news media privilege, asserted by appellants throughout these proceedings, had been waived. This motion was denied and an appeal was taken to this Court. In response to an inquiry by the Court, the Attorney General filed a letter which contained, inter alia, a motion for direct certification.
The Attorney General's motions for leave to appeal and for direct certification were granted, as was the appellants' motion for direct certification.

I

The First Amendment
Appellants claim a privilege to refrain from revealing information sought by the subpoenas duces tecum essentially for the reason that were they to divulge this material, confidential sources of such information would be made public. Were this to occur, they argue, newsgathering and the dissemination of news would be seriously impaired, because much information would never be forthcoming to the news media unless the persons who were the sources of such information could be entirely certain that their identities would remain secret. The final result, appellants claim, would be a substantial lessening in the supply of available news on a variety of important and sensitive issues, all to the detriment of the public interest. They contend further that this privilege to remain silent with respect to confidential information and the sources of such information emanates *266 from the "free speech" and "free press" clauses of the First Amendment.[1]
In our view the Supreme Court of the United States has clearly rejected this claim and has squarely held that no such First Amendment right exists. In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), three news media representatives argued that, for the same reason here advanced, they should not be required to appear and testify before grand juries, and that this privilege to refrain from divulging information, asserted to have been received from confidential sources, derived from the First Amendment. Justice White, noting that there was no common law privilege, stated the issue and gave the Court's answer in the first paragraph of his opinion:
The issue in these cases is whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment. We hold that it does not. [Branzburg v. Hayes, supra, 408 U.S. at 667, 92 S.Ct. at 2649, 33 L.Ed.2d at 631 [1972]]
In that case one reporter, from Frankfort, Kentucky, had witnessed individuals making hashish from marijuana and had made a rather comprehensive survey of the drug scene in Frankfort. He had written an article in the Louisville Courier-Journal describing this illegal activity. Another, a newsman-photographer employed by a New Bedford, Massachusetts television station, had met with members of the Black Panther movement at the time that certain riots and disorders occurred in New Bedford. The material he assembled formed the basis for a television program that *267 followed. The third investigative reporter had met with members of the Black Panthers in northern California and had written an article about the nature and activities of the movement. In each instance there had been a commitment on the part of the media representative that he would not divulge the source of his article or story.
By a vote of 5 to 4 the Supreme Court held that newspaper reporters or other media representatives have no privilege deriving from the First Amendment to refrain from divulging confidential information and the sources of such information when properly subpoenaed to appear before a grand jury. The three media representatives were directed to appear and testify. The holding was later underscored and applied directly to this case by Justice White in a brief opinion filed in this cause upon the occasion of his denial of a stay sought by these appellants. He said,
There is no present authority in this Court either that newsmen are constitutionally privileged to withhold duly subpoenaed documents material to the prosecution or defense of a criminal case or that a defendant seeking the subpoena must show extraordinary circumstances before enforcement against newsmen will be had. [New York Times and Farber v. Jascalevich, ___ U.S. ___, 99 S.Ct. 6, 10, 58 L.Ed.2d 25, 30-31 (1978)]
We pause to point out that despite the holding in Branzburg, those who gather and disseminate news are by no means without First Amendment protections. Some of these are referred to by Justice White in the Branzburg opinion. See 408 U.S. at 681-2, 92 S.Ct. at 2656-57, 33 L.Ed.2d at 639-40. They include, among others, the right to publish what the press chooses to publish, to refrain from publishing what it chooses to withhold, to seek out news in any legal manner and to refrain from revealing its sources except upon legitimate demand. Demand is not legitimate when the desired information is patently irrelevant to the needs of the inquirer or his needs are not manifestly compelling. Nor will the First Amendment sanction harassment of the press. *268 These do not exhaust the list of such First Amendment protective rights.
The point to be made, however, is that among the many First Amendment protections that may be invoked by the press, there is not to be found the privilege of refusing to reveal relevant confidential information and its sources to a grand jury which is engaged in the fundamental governmental function of "[f]air and effective law enforcement aimed at providing security for the person and property of the individual ..." [408 U.S. at 690, 92 S.Ct. at 2661, 33 L.Ed.2d at 644]. The reason this is so is that a majority of the members of the United States Supreme Court have so determined.
Faced with this conclusion, appellants appear to argue that Justice Powell's concurring opinion in Branzburg somehow fails to support this result. The argument is without merit. We do not read Justice Powell's opinion as in any way disagreeing with what is said by Justice White. But even if it did, it would not matter for present purposes. The important and conclusive point is that five members of the Court have all reached the conclusion that the First Amendment affords no privilege to a newsman to refuse to appear before a grand jury and testify as to relevant information he possesses, even though in so doing he may divulge confidential sources. The particular path that any Justice may have followed becomes unimportant when once it is seen that a majority have reached the same destination.
Thus we do no weighing or balancing of societal interests in reaching our determination that the First Amendment does not afford appellants the privilege they claim. The weighing and balancing has been done by a higher court. Our conclusion that appellants cannot derive the protection they seek from the First Amendment rests upon the fact that the ruling in Branzburg is binding upon us and we interpret it as applicable to, and clearly including, the particular issue framed here. It follows that the obligation to appear at a criminal trial on behalf of a defendant who is *269 enforcing his Sixth Amendment rights is at least as compelling as the duty to appear before a grand jury.

II

The Shield Law[2]
In Branzburg v. Hayes, supra, the Court dealt with a newsman's claim of privilege based solely upon the First *270 Amendment. As we have seen, this claim of privilege failed. In Branzburg no shield law was involved. Here we have a shield law, said to be as strongly worded as any in the country.
We read the legislative intent in adopting this statute in its present form as seeking to protect the confidential sources of the press as well as information so obtained by reporters and other news media representatives to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey. It is abundantly clear that appellants come fully within the literal language of the enactment. Extended discussion is quite unnecessary. Viewed solely as a matter of statutory construction, appellants are clearly entitled to the protections afforded by the *271 act unless statutory exceptions including waiver are shown to apply. In view of the fundamental basis of our decision today, the question of waiver of privilege under the Shield Law need not be addressed by us.

III

The Sixth Amendment[3]and its New Jersey Counterpart[4]
Viewed on its face, considered solely as a reflection of legislative intent to bestow upon the press as broad a shield as possible to protect against forced revelation of confidential source materials, this legislation is entirely constitutional. Indeed, no one appears to have attacked its facial constitutionality.
It is, however, argued, and argued very strenuously, that if enforced under the facts of this case, the Shield Law violates the Sixth Amendment of the Federal Constitution as well as Article 1, ¶ 10 of the New Jersey Constitution. These provisions are set forth above. Essentially the argument is this: The Federal and State Constitutions each *272 provide that in all criminal prosecutions the accused shall have the right "to have compulsory process for obtaining witnesses in his favor." Dr. Jascalevich seeks to obtain evidence to use in preparing and presenting his defense in the ongoing criminal trial in which he has been accused of multiple murders. He claims to come within the favor of these constitutional provisions  which he surely does. Finally, when faced with the Shield Law, he invokes the rather elementary but entirely sound proposition that where Constitution and statute collide, the latter must yield. Subject to what is said below, we find this argument unassailable.
The compulsory process clause of the Sixth Amendment has never been elaborately explicated by the Supreme Court. Not until 1967, when it decided Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 had the clause been directly construed. Westen, Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases, 91 Harv. L. Rev. 567, 586 (1978). In Washington the petitioner sought the reversal of his conviction for murder. A Texas statute at the time provided that persons charged or convicted as co-participants in the same crime could not testify for one another. One Fuller, who had already been convicted of the murder, was prevented from testifying by virtue of the statute. The record indicated that had he testified his testimony would have been favorable to petitioner. The Court reversed the conviction on the ground that petitioner's Sixth Amendment right to compulsory process had been denied. At the same time it determined that the compulsory process clause in the Sixth Amendment was binding on state courts by virtue of the due process clause of the Fourteenth Amendment. It will be seen that Washington is like the present case in a significant respect. The Texas statute and the Sixth Amendment could not both stand. The latter of course prevailed. So must it be here.
Quite recently, in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Court dealt with another compulsory process issue. There the Special *273 Prosecutor, Leon Jaworski, subpoenaed various tape recordings and documents in the possession of President Nixon. The latter claimed an executive privilege and refused to deliver the tapes. The Supreme Court conceded that indeed there was an executive privilege and that although "[n]owhere in the Constitution ... is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based." 418 U.S. at 711, 94 S.Ct. at 3109, 41 L.Ed.2d at 1065. Despite this conclusion that at least to some extent a president's executive privilege derives from the Constitution, the Court nonetheless concluded that the demands of our criminal justice system required that the privilege must yield.
We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense. [United States v. Nixon, supra, 418 U.S. at 709, 94 S.Ct. at 3108, 41 L.Ed.2d at 1064]
It is important to note that the Supreme Court in this case compelled the production of privileged material  the privilege acknowledged to rest in part upon the Constitution  even though there was no Sixth Amendment compulsion to do so. The Sixth Amendment affords rights to an accused but not to a prosecutor. The compulsion to require the production of the privileged material derived from the necessities of our system of administering criminal justice.
Article 1, ¶ 10 of the Constitution of the State of New Jersey contains, as we have seen, exactly the same *274 language with respect to compulsory process as that found in the Sixth Amendment. There exists no authoritative explication of this constitutional provision. Indeed it has rarely been mentioned in our reported decisions. We interpret it as affording a defendant in a criminal prosecution the right to compel the attendance of witnesses and the production of documents and other material for which he may have, or may believe he has, a legitimate need in preparing or undertaking his defense. It also means that witnesses properly summoned will be required to testify and that material demanded by a properly phrased subpoena duces tecum will be forthcoming and available for appropriate examination and use.
Testimonial privileges, whether they derive from common law or from statute, which allow witnesses to withhold evidence seem to conflict with this provision. This conflict may arise in a variety of factual contexts with respect to different privileges.[5] We confine our consideration here to the single privilege before us  that set forth in the Shield Law. We hold that Article 1, ¶ 10 of our Constitution prevails over this statute, but in recognition of the strongly expressed legislative viewpoint favoring confidentiality, we prescribe the imposition of the safeguards set forth in Point IV below.

IV

Procedural Mechanism
Appellants insist that they are entitled to a full hearing on the issues of relevance, materiality and overbreadth of the subpoena. We agree. The trial court recognized its obligation *275 to conduct such a hearing, but the appellants have aborted that hearing by refusing to submit the material subpoenaed for an in camera inspection by the court to assist it in determining the motion to quash. That inspection is no more than a procedural tool, a device to be used to ascertain the relevancy and materiality of that material. Such an in camera inspection is not in itself an invasion of the statutory privilege. Rather it is a preliminary step to determine whether, and if so to what extent, the statutory privilege must yield to the defendant's constitutional rights.
Appellants' position is that there must be a full showing and definitive judicial determination of relevance, materiality, absence of less intrusive access, and need, prior to any in camera inspection. The obvious objection to such a rule, however, is that it would, in many cases, effectively stultify the judicial criminal process. It might well do so here. The defendant properly recognizes Myron Farber as a unique repository of pertinent information. But he does not know the extent of this information nor is it possible for him to specify all of it with particularity, nor to tailor his subpoena to precise materials of which he is ignorant. Well aware of this, Judge Arnold refused to give ultimate rulings with respect to relevance and other preliminary matters until he had examined the material. We think he had no other course. It is not rational to ask a judge to ponder the relevance of the unknown.
The same objection applies with equal force to the contention that the subpoena is overbroad. Appellants do not assert that the subpoena is vague and uncertain, but that the data requested may not be relevant and material. To deal effectively with this assertion it is not only appropriate but absolutely necessary for the trial court to inspect in camera the subpoenaed items so that it can make its determinations on the basis of concrete materials rather than in a vacuum. The appellant's reliance upon State v. Cooper, 2 N.J. 540 (1949) is misplaced. There the subpoena was vague and uncertain on its face and violative of R.R. 2:5-8. (Now R. 1:9-2).
*276 While we agree, then, that appellants should be afforded the hearing they are seeking, one procedural aspect of which calls for their compliance with the order for in camera inspection, we are also of the view that they, and those who in the future may be similarly situated, are entitled to a preliminary determination before being compelled to submit the subpoenaed materials to a trial judge for such inspection. Our decision in this regard is not, contrary to the suggestion in some of the briefs filed with us, mandated by the First Amendment; for in addition to ruling generally against the representatives of the press in Branzburg, the Court particularly and rather vigorously, rejected the claims there asserted that before going before the grand jury, each of the reporters, at the very least, was entitled to a preliminary hearing to establish a number of threshold issues. Branzburg v. Hayes, supra, 408 U.S. at 701-07, 92 S.Ct. 2666, 69, 33 L.Ed.2d at 651-55. Rather, our insistence upon such a threshold determination springs from our obligation to give as much effect as possible, within ever-present constitutional limitations, to the very positively expressed legislative intent to protect the confidentiality and secrecy of sources from which the media derive information. To this end such a determination would seem a necessity.
The threshold determination would normally follow the service of a subpoena by a defendant upon a newspaper, a reporter or other representative of the media. The latter foreseeably would respond with a motion to quash. If the status of the movant  newspaper or media representative  were not conceded, then there would follow the taking of proofs leading to a determination that the movant did or did not qualify for the statutory privilege. Assuming qualification, it would then become the obligation of the defense to satisfy the trial judge, by a fair preponderance of the evidence including all reasonable inferences, that there was a reasonable probability or likelihood that the information sought by the subpoena was material and relevant to his defense, that it could not be secured from any less intrusive *277 source, and that the defendant had a legitimate need to see and otherwise use it.
The manner in which the obligation of the defendant is to be discharged in the proceedings leading to this threshold determination will depend largely upon the facts of the particular case. We wish to make it clear, however, that this opinion is not to be taken as a license for a fishing expedition in every criminal case where there has been investigative reporting, nor as permission for an indiscriminate rummaging through newspaper files.
Although in this case the trial judge did not articulate the findings prescribed above, it is perfectly clear that on the record before him a conclusion of materiality, relevancy, unavailability of another source, as well as need was quite inescapable. A review of the record in the exercise of our original jurisdiction, R. 2:10-5, reveals that the knowledge possessed by the trial judge and the material before him at the time he made his determination to conduct an in camera inspection afforded a more than adequate factual basis upon which to rest a conclusion that the threshold prerequisites set forth above were in fact fully met. We deem it quite unnecessary to remand the case in order to have the judge set forth formally what we find to be abundantly clear. We set forth below our reasons for this conclusion.
As of June 30, 1978, the date of the challenged decision to examine the materials in camera, Judge Arnold had been trying the case for about 18 weeks. He had dealt with earlier pre-trial motions. His knowledge of the factual background and of the part Farber had played was intimate and pervasive. Perhaps most significant is the trial court's thorough awareness of appellant Farber's close association with the Prosecutor's office since a time preceding the indictment. This glaring fact of their close working relationship may well serve to distinguish this case from the vast majority of others in which defendants seek disclosure from newsmen in the face of the Shield Law. Two and a half months before his June 30th decision, Judge Arnold observed,
*278 The facts show that Farber has written articles for the New York Times about this matter, commencing in January 1976. According to an article printed in the New York Times (hereinafter the Times) on January 8, 1976, Farber showed Joseph Woodcock, the Bergen County Prosecutor at that time, a deposition not in the State's file and provided additional information that convinced the prosecutor to reopen an investigation into some deaths that occurred at Riverdell Hospital. [State v. Jascalevich; In the Matter of the Application of Myron Farber and the New York Times Company re: Sequestration, 158 N.J. Super. 488, 490 (Law Div. 1978), (emphasis added)]
And
The court has examined the news stories in evidence and they demonstrate exceptional quality, a grasp of intricate scientific knowledge, and a style of a fine journalist. They, also, demonstrate considerable knowledge of the case before the court and deep involvement by Farber, showing his attributes as a first-rate investigative reporter. However, if a newspaper reporter assumes the duties of an investigator, he must also assume the responsibilities of an investigator and be treated equally under the law, unless he comes under some exception. [Id. at 493-94, (emphasis added)]
In the same vein is a letter before the trial court dated January 14, 1977 from Assistant Prosecutor Moses to Judge Robert A. Matthews, sitting as a Presiding Judge in the Appellate Division, undertaking to explain "how the investigation, from which the [Jascalevich] indictment resulted, came to be reopened." In the course of that explanation it is revealed that sometime in the latter part of 1975 "a reporter for the New York Times began an investigation into the 1965-66 deaths and circumstances surrounding them. The results of the New York Times inquiry were made available to the Prosecutor. It was thus determined that there were certain items which were not in the file of the Prosecutor." [Emphasis added]
Further support for the determination that there is a reasonable probability that the subpoenaed materials meet the test formulated above appears in the following factual circumstances pointed to by this defendant and supported by *279 documents and transcripts of testimony found in the appendix filed by the defendant:
1. A principal witness for the State is Dr. Michael Baden, a New York City Medical Examiner, who testified that Farber communicated with him prior to any official communication from the Prosecutor's office. The defendant would have one infer from this that Farber stimulated Baden's research into the causal connection among curare, the deaths, and Dr. Jascalevich, then turned the results of this joint effort over to the Prosecutor. (Trial testimony elicited from Dr. Baden after June 30th, the date of Judge Arnold's order, is said to furnish further support for this inference.) While no sinister implications need flow from this, it arguably serves to buttress the defense assertion that the driving power behind this prosecution is Farber, and hence such materials, if any, that he may be secreting are reasonably likely to bear on the guilt or innocence of Dr. Jascalevich.
2. Dr. Stanley Harris was a surgeon at the hospital where the criminal activities are said to have occurred. His suspicions are said to have been aroused by the unexplained deaths of some of his patients. Dr. Harris admits having spoken to Farber five times before the New York Times articles appeared and before his reinterview by the Prosecutor's office in 1976. He is characterized by the criminal defendant as his "principal accuser," and therefore whatever otherwise unavailable information Farber extracted from him would, with reasonable probability, bear upon Dr. Jascalevich's guilt or innocence.
3. Lee Henderson was an attendant at Seton Hall Medical School at a time when, according to one statement allegedly made by Dr. Jascalevich, the latter was performing certain tests on dogs in the School laboratory. The tests supposedly involved the effects of curare (a drug said to have been administered by the criminal defendant in producing the deaths of the victims). Henderson may very well have information touching upon Dr. Jascalevich's activities, if any, in the laboratory. After considerable effort Farber succeeded in *280 tracking down Henderson in South Carolina. When a Prosecutor's investigator was later able to communicate with Henderson (having presumably been led to him by information furnished by Farber), the witness initially refused to give a statement (later supplied) for fear that it would conflict with a written statement previously furnished to Farber. The criminal defendant wishes to examine this earlier statement.
4. Herman Fuhr was an operating room attendant who opened Dr. Jascalevich's locker at Riverdell Hospital, where curare was allegedly stored. Farber interviewed him. He will not speak to defense representatives.
5. Dr. Charles Umberger was a toxicologist who worked on slides of one of the alleged victims. He gave notes to Farber who did not return them. Some of these notes are missing. Dr. Umberger died in 1977 before the defense could interview him.
6. Barbara Kenderes was a lab technician at the hospital. She gave a statement to a Prosecutor's detective in 1966, which the State either has not furnished or cannot furnish to the defense. She testified before the grand jury in March, 1976. Several days later Mrs. Kenderes received a telephone call on her private, unlisted number from Myron Farber. During the course of the conversation he accused her of hiding something from him. She replied that, indeed, she was. Shortly thereafter, she received a call from Assistant Prosecutor Sybil Moses, who is handling the case. Mrs. Moses told Mrs. Kenderes that Myron Farber called her and said Mrs. Kenderes was hiding something. Mrs. Moses wanted to know what that was. Mrs. Kenderes replied that it was only the fact that she had appeared before the grand jury, which Mrs. Moses had cautioned her not to speak about. The only person to whom Mrs. Kenderes had given her private phone number in connection with this matter was Mrs. Moses. Again the inference defendant Jascalevich would have us draw is that early on there was complete cooperation and exchange of information between the Prosecutor's office and Farber, with the resultant likelihood that Farber is now, *281 and for some time has been, in possession of material and relevant information not otherwise obtainable bearing on the guilt or innocence of Dr. Jascalevich.
We hasten to add that we need not, and do not, address (much less determine) the truth or falsity of these assertions. The point to be made is that these are the assertions of the criminal defendant supported by testimonial or documentary proof; and based thereon it is perfectly clear that there was more than enough before Judge Arnold to satisfy the tests formulated above. Of course all of this information detailed above has long been known to appellants. Accordingly we find that preliminary requirements for in camera inspection have been met.
We have considered appellants' other contentions as to lack of jurisdiction and the like. So far as they are relevant to the matters herein decided we find them to lack merit.
The judgment of conviction of criminal contempt and that in aid of litigants' rights are affirmed. Stays heretofore entered are vacated effective as of 4:00 P.M., Tuesday, September 26, 1978.
HUGHES, C.J., concurring.
I join in the comprehensive opinion of Justice Mountain and would briefly refer to factors which seem to me particularly reassuring in justification of that opinion. As pointed out, Judge Arnold in his threshold rulings was quite familiar with testimony introduced in a very long trial. As mentioned by Justice Mountain, this record included testimonial reference to the activities of Myron Farber and to the statements of material trial witnesses, which Farber possesses as agent of the respondent The New York Times. These statements, as shown by the trial record, are demonstrably inaccessible to the criminal trial defendant and should obviously be subject to comparison with the present trial testimony of various witnesses who have made such statements.
It would of course have been better practice for the trial judge to have documented references to that testimonial record to demonstrate, at the threshold: (1) probable relevance *282 and materiality, (2) absence of opportunity for less intrusive access to the material demanded, (3) the status of any Shield Law protection and (4) the substantial reality of a consequent Sixth Amendment right to the evidence on the part of the defendant. The failure to have done so, however, should not be conclusive in the face of respondents' intransigence. Considering that today we have found the threshold requirements to be evident in the record, as doubtless did Judge Arnold as the basis for his rulings, it is clear that respondents have denied to the court in camera access to the only factual base upon which any court could have proceeded from that point to hear proofs and argument and then intelligently and finally determine those issues.
In this context, then, respondents have not truly been denied a hearing  they have intentionally withheld from the court the only foundation (that is to say, in camera consideration such as occurs in equally important Fifth Amendment cases) upon which any sensible final hearing and determination could have been based. In that respect they have aborted, alike, any possible fuller hearing and any possible substantive determination based on such a hearing.
Considered in this way, respondents have in fact had all the hearing to which they are presently entitled  that is to say a full consideration of their claimed Shield Law privilege to the extent that such asserted right may be adjudicated in vacuo. Their claim to a final adjudication without an in camera scrutiny by the court upon which to base its decision would project the absurd proposition that the press, and not the courts, should be the final arbiter of the constitutional mandate.
Such a conclusion would be discordant with the entire history of constitutional adjudication since the foundation of the Republic. It would be destructive of values upon which our constitutional democracy rests, that is to say, on the premise that the Constitution is supreme over the transitory will of any man, or of any group of men, or of the Congress itself, or even of a President, or of the press, or of *283 any special interest, no matter how worthy. In the perspective of history, given the need for freedom of the press and religion, of free speech and assemblage and other rights of free people, all such rights are diminished if men may be condemned without the right to fair trial and without compulsory process to effectuate that right. For in the end, this was the constitutional purpose  that all men might be equal before the law  and thus free to seek without restraint those common goals identified by our ancestors  life, liberty and the pursuit of happiness. All these are affronted and endangered intolerably, if fair trial is denied to anyone.
PASHMAN, J., dissenting.
I respectfully dissent from the Court's affirmance of the judgments of civil and criminal contempt entered below. Subjecting appellants to sanctions for failure to comply with a judicial order prior to an adjudication as to their legal obligation to comply with that order runs counter to the core concept of our legal system  due process of law. This is not a case in which appellants' claims of privilege are frivolous and easily disposed of; quite the contrary, substantial questions are herein presented concerning appellants' rights under both the First Amendment and the New Jersey News Media Privilege Act to refuse to disclose sources and confidential information gathered in the course of appellant-Farber's investigative reporting activities. Since appellants were denied an opportunity to present these claims prior to the imposition against them of coercive and punitive sanctions, the judgments of contempt must be vacated and the case remanded for a hearing to determine the merits of their objections.
The main question posed by the present case is whether the New York Times Company and Myron Farber may be adjudged to be in civil and criminal contempt for their refusal to comply with an order of the judge presiding over the trial in State v. Jascalevich to produce certain materials *284 for in camera inspection before the merits of various proffered defenses are heard and decided. Other significant questions concern the scope of the New Jersey News Media Privilege Act and the type of hearing that should have been accorded appellants.
My resolution of this controversy makes unnecessary a consideration of appellants' claims that the subpoena is impermissibly overbroad, see State v. Cooper, 2 N.J. 540 (1949), and that the lower court was without jurisdiction to enter contempt judgments against them. Suffice it to say that grave doubts exist as to the manner in which these issues were treated below.

I

Denial of Due Process
The most fundamental tenet of our legal system is that no man can be deprived of life, liberty or property without due process of law. While due process is a flexible concept whose requirements will vary from case to case, there can be no doubt that at a minimum it mandates that deprivations of liberty or property be preceded by an opportunity to be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). Where, as here, First Amendment interests are implicated, especially stringent procedural safeguards are required. See, e.g., Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); L. Tribe, American Constitutional Law, §§ 12-34 to 12-36 (1978).
At no point prior to the rendition of the contempt judgments were appellants accorded an opportunity to marshall legal arguments against in camera production of the subpoenaed materials. Their claims that the subpoena is impermissibly overbroad and that compelled in camera disclosure *285 is forbidden by the First Amendment and the New Jersey Shield Law, N.J.S.A. 2A:84A-21, were denied consideration both at the motion to quash the subpoena and during contempt proceedings.
The majority's assertion that appellants were indeed accorded a due process hearing prior to in camera inspection is simply without foundation in the record. In fact, it directly contradicts the express words of the trial judge. In response to appellants' contentions that in camera disclosure was legally impermissible, the judge stated:
When the items are produced, this Court will give the applicants a full hearing as to the materiality of the subpoena, its scope and its contents.
The Court will also decide if the items are barred by the Shield Law and any other legitimate defense that may be asserted.
In effect, appellants were to be afforded an opportunity to contest the legality of in camera disclosure only after the materials had been so disclosed. Such a result not only turns logic on its head, but, more importantly, makes a mockery of "due process." See In re Vornado, Inc., 159 N.J. Super. 32, 38 (App. Div. 1978), certif. den. 77 N.J. 489 (1978).
Farber has therefore never received the hearing to which he is constitutionally entitled. I find it totally unimaginable that the majority can even consider allowing a man to be sent to jail without a full and orderly hearing at which to present his defenses. Mr. Farber probably assumed, as did I, that hearings were supposed to be held and findings made before a person went to jail and not afterwards.

II

New Jersey News Media Privilege
The appellants' claims as to the privileged nature of the subpoenaed materials are clearly cogent under N.J.S.A. 2A:84A-21. That statute provides, in pertinent part:
*286 * * * [A] person * * * connected with, or employed by news media for the purpose of gathering * * * or disseminating news for the general public or on whose behalf news is so gathered * * * or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere
a. The source * * * from or through whom any information was procured [;] * * * and
b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
This case is the first major test of New Jersey's new "Shield Law." There is no reason to accord this statute an unfriendly reception in any court of this State. There should be no eagerness to narrow or circumvent it. The Shield Law is not an irritation. It is an act of the Legislature.
This law was passed in the aftermath of the Supreme Court's decision in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). In Branzburg, the Court held that the First Amendment will not always prevent forced disclosure of a reporter's confidential sources and information. More specifically, it ruled that the reporters there involved had no privilege under the First Amendment against being compelled, on pain of contempt, to reveal such confidential data to an investigating grand jury. In its view, the resulting infringement upon the reporters' investigating abilities was outweighed by the grand jury's need to have everyman's evidence.
The Court emphasized, however, that state legislatures were not powerless to alter the result reached in Branzburg. As Justice White stated:
At the federal level, Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate. There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials *287 and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.
[408 U.S. at 706, 92 S.Ct. at 2669; emphasis supplied]
The News Media Privilege Act was New Jersey's response to the Court's invitation. This Act reflects our Legislature's judgment that an uninhibited news media is more important to the proper functioning of our society than is the ability of either law enforcement agencies, the courts or criminal defendants to gain access to confidential news data.
It cannot be doubted that this legislative judgment rests upon a firm foundation. News media keep the public abreast of goings-on, both public and private, and thus make possible "[e]nlightened choice[s] by an informed citizenry"  "the basic ideal upon which an open society is premised * * *" Branzburg v. Hayes, 408 U.S. 665, 726, 92 S.Ct. 2646, 2672, 33 L.Ed.2d 626 (1972) (Stewart, J., dissenting). Not only does a free press provide people with a wide range of facts and opinion, but, by exposing the actions of public officials, it serves as a check upon governmental error and abuse. See, e.g., Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 539, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). As such, it is an "incontestable precondition of self-government." Branzburg, supra, 408 U.S. at 726, 92 S.Ct. 2646 (Stewart, J., dissenting). In the words of James Madison:
* * * A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps, both. Knowledge will forever govern ignorance; and a people who mean to be their own Governors must arm themselves with the power which knowledge gives.
[Letters and Other Writings of James Madison, Fourth President of the United States, Vol. 3, p. 276 (1865 ed.)]
It was perhaps for this reason that Justice Douglas concluded that "[t]here is no higher function performed under our constitutional regime" than that of reporting the news. *288 Branzburg, supra, at 722, 92 S.Ct. at 2696 (Douglas, J., dissenting).
A reporter's ability to obtain sensitive information depends on his reputation for keeping confidences. Once breached  that reputation is destroyed. Potential sources of information can no longer rest secure that their identities and confidences will remain free from disclosure.
Realizing that strict confidentiality is essential to the workings of a free press, our Legislature, through the News Media Privilege Act, has granted reporters an immunity from disclosure which is both absolute and comprehensive. Any person connected with any news media for the purpose of gathering or disseminating news is granted the privilege of refusing to disclose, in any legal or quasi-legal proceeding or before any investigative body, both the source of and any information acquired.
Courts are thus given no discretion to determine on a case-by-case basis whether the societal importance of a free and robust press is "outweighed" by other assertedly compelling interests. The Legislature has done the weighing and balancing and has determined that in every case the right to non-disclosure is paramount. If a reporter falls within the ambit of the statute, he has a privilege of non-disclosure.
This privilege exists not only with respect to public disclosures; it encompasses revelations to any legal or quasi-legal body, including "any court." Even forced in camera disclosures are thus prohibited. Indeed, any other conclusion would subvert the policies underlying the statute. As Justice Marshall noted, denying a stay in this case:
Many potential criminal informants * * * might well refuse to provide information to a reporter if they knew that a judge could examine the reporter's notes upon the request of a defendant.
[___ U.S. ___, 99 S.Ct. 11, 58 L.Ed.2d 38 (1978)]
Further, the specter of forced in camera disclosure may, in the words of Justice Douglas, "cause editors and critics to *289 write with more restrained pens." Branzburg v. Hayes, supra 408 U.S. at 721, 92 S.Ct. at 2691 (1972) (Douglas, J., dissenting).
The majority intimates that a reporter may lose the protection of the Shield Law if he can also be deemed an "investigator." See ante at 278. All good reporting must be investigative. If reporting is to be imaginative and understandable, the facts and leads must be searched out. Such resourceful, probing journalism first exposed most of the serious governmental scandals. The process helps people learn what they need to know. To hamper it is to hamper ourselves. To hold therefore that the Shield Law is not applicable to a reporter who is also an investigator is to hold that the Shield Law will never be applicable.[1]
Branzburg makes clear that the Shield Law is a permissible exercise of legislative authority. As the product of a co-equal branch of government, it must be respected by our Courts.
Appellants' position that the Media Privilege Act prohibits forced in camera disclosure of confidential data is thus meritorious. Since this is so, it is unnecessary to pass upon their claims that the First Amendment also protects them from such forced disclosure.

III

Necessity for Hearing
Jascalevich asserts that the materials subpoenaed in the present case are relevant to his defense, and hence non-disclosure will deprive him of his Fifth and Sixth Amendment rights to a fair trial. It is of course axiomatic that a *290 statute cannot be applied so as to abridge an individual's constitutional rights. However, if the materials are ordered turned over for in camera inspection in order that a determination be made as to their relevance to Jascalevich's defense, appellants' statutory privilege of non-disclosure will be eviscerated.
How to deal with this state of affairs? It is submitted that an almost identical situation was faced by the Supreme Court in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and that the Court's solution to the problem in that case should serve as a guide to the case at hand. In Nixon, the production of subpoenaed presidential material was resisted on grounds of "executive privilege." Disclosure of the data was sought by presidential aides who were criminal defendants as well as by the prosecutors. In the course of its opinion, the Court noted that before the "weighty" interest in confidentiality was undermined by even in camera disclosure, those desirous of obtaining the information were required to make a threshold showing as to the relevance, materiality and necessity of the data to the conduct of the trial. In that case, the Special Prosecutor had met this threshold burden. In the words of the lower court, he had made "a lengthy and detailed showing of [the Government's] need for the subpoenaed items and their relevance." United States v. Mitchell, 377 F. Supp. 1326, 1328 aff'd sub nom. United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). See also Brown v. Commonwealth, 214 Va. 755, 204 S.E.2d 429 (S.Ct.), cert. den. 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974); State v. St. Peter, 132 Vt. 266, 315 A.2d 254 (S.Ct. 1974).
The need to impose such a threshold burden upon a criminal defendant is at once manifest. Absent such a requirement, nothing prevents any person accused of a crime from embarking upon "fishing expeditions" into a news media's files. Such rummaging of a newspaper's records cannot be permitted. See Brown v. Commonwealth, supra; State v. St. Peter, supra.
*291 Case law demonstrates that a criminal defendant's Fifth and Sixth Amendment rights will be undermined only if subpoenaed data are relevant, material and necessary to the defense. If the information is irrelevant or immaterial or unnecessary to Jascalevich's defense, or if alternate sources of this information exist, then non-production will not impair his constitutional rights; hence, disclosure cannot be mandated. See Brown v. Commonwealth, supra; State v. St. Peter, supra.
This cause must therefore be remanded for a hearing prior to a decision regarding appellants' obligation to disclose the subpoenaed materials. At this hearing, evidence can be adduced relating to: (1) the applicability of the Media Privilege to the information sought to be obtained by Dr. Jascalevich; (2) the existence of a waiver of that privilege; and (3) the relevance, materiality and necessity of the subpoenaed data to Jascalevich's defense. The latter inquiry will, of course, encompass a determination as to the existence of alternate sources of information. Since the Media Privilege Act prohibits even compelled in camera disclosure, such disclosure should not be ordered, as in Nixon, unless and until Jascalevich has made a threshold showing that the materials are relevant, material and necessary.
The majority suggests that a hearing can be dispensed with, or that its outcome will be foreordained, in every case in which a reporter possesses "considerable knowledge of [a criminal] case." See ante at 278. Such a conclusion nullifies the provisions of the Media Privilege Act. In effect, the majority has ruled that Shield Law protection will be withdrawn from reporters who perform their jobs competently  that is, those who gain "considerable knowledge" concerning a criminal case. A hearing as to relevance, materiality, and necessity must be conducted in all cases in which the privilege is invoked. Compelled in camera disclosure must be prohibited unless and until the defendant has met his threshold burden in accordance with the procedures to be discussed below.
*292 Those procedures  which will apply to all who may be similarly situated  should be as follows:
(1) The person claiming the privilege should be required to make a prima facie showing that he is a newsperson and that he obtained the subpoenaed materials in the course of his newsgathering duties. This is subject to rebuttal by Dr. Jascalevich; Jascalevich may also show waiver of the privilege.
(2) If the judge finds that the privilege is arguably applicable, then the burden should shift to Dr. Jascalevich to make a threshold showing (a) that the data are relevant, material and necessary to his defense and (b) that no less intrusive means of gaining the information are extant. This showing must demonstrate what the materials are expected to show with sufficient specificity to allow the trial judge to make an independent judgment thereon. Appellants Farber and the Times should then be given an opportunity to rebut Jascalevich's showing. If the judge finds that any or all of the requested data are irrelevant, unnecessary or immaterial, he must quash the subpoena as to such materials.
(3) If the judge finds that Jascalevich has made a threshold showing with respect to any of the subpoenaed materials, he should order these materials  and only these materials  produced for in camera inspection. In order that appellants' rights be infringed to the least extent possible, appellants should be permitted to delete the names of informants and any other identificational indicia during this stage of the proceedings.
(4) After the judge has inspected the material, he should make a determination as to whether any portion is relevant, material and necessary to Dr. Jascalevich's defense. He must also decide whether that material will probably be admissible at trial. United States v. Nixon, supra, 418 U.S. at 714, 94 S.Ct. 3090. If these criteria are satisfied, then that portion of the material should be released to Jascalevich. All other material must be returned to appellants. Counsel should have an opportunity to be heard.
*293 (5) Then judge must make findings of fact and conclusions of law at each stage of the proceedings.
(6) Either party may seek leave to appeal the judge's decision as to in camera inspection or release of information after inspection.
Throughout all stages of the proceeding, the judge should constantly keep in mind the strong presumption against disclosure of protected materials. All doubts concerning disclosure should be resolved in favor of non-disclosure.
I am mindful that this inquiry will take place in the context of an ongoing murder trial and that delays are undesirable. Therefore, I do not expect that this hearing will be drawn out. The trial judge possesses sufficient powers to ensure that the hearing proceeds expeditiously.
It must be emphasized that such a hearing is to be conducted only in cases in which a criminal defendant asserts that privileged data are necessary to his defense. In all other situations in which the News Media privilege is invoked, no constitutional concerns will exist. Hence, given the absolute nature of the statutory privilege, compelled disclosure is forbidden.
No such hearing was held prior to the trial judge's order that the subpoenaed materials be produced for in camera inspection. The majority admits as much. See ante at 277. However, instead of remanding the cause, it invokes its original jurisdiction under R. 2:10-5 in a "patchwork" attempt to make findings of fact essential to its disposition of this controversy. In view of the importance of the questions presented and the state of the record below, this venture into the province of the trial judge is both unwarranted and unwise. An appellate court should rarely engage in original factfinding; its distance from the proceedings below makes factual judgments very difficult. It is not rational to expect that a Court so removed will adequately perform this function. When the issues are of constitutional magnitude, such an undertaking is especially undesirable. A decision whose *294 impact will be felt by many persons in many places should not be the product of an incomplete record.
Even were I to agree that original factfinding is appropriate, I could not sanction the manner in which the majority has found its "facts." The trial judge's conclusions upon which the majority places so much reliance were not the product of a hearing below in which appellants were allowed to participate. Rather, these conclusions derive solely from the judge's examination of a handful of newspaper articles. See State v. Jascalevich, 158 N.J. Super. 488, 493 (Law Div. 1978). The "further support" upon which the majority bases its findings of fact, see ante at 278-281, does not even derive from the trial judge. Instead, the majority's "findings" are taken substantially verbatim from conclusory allegations contained in the statement of facts section of the brief for Dr. Jascalevich. This amalgam of post-hoc, ex parte, and newspaper article "factfinding" is not my idea of what a Shield Law hearing is all about.

IV

Conclusion
I believe the majority holding results in the Shield Law leaving a reporter unshielded and the free press not-so-free. Justice Frankfurter once noted that any court can properly decide a case if only a single principle is in controversy. The difficulty is that this case entails more than one so-called principle. It is therefore a hard case that is destined to make bad law. The victims will be the press, the courts and the public interest.
Appellants were never accorded a Shield Law hearing prior to the imposition against them of contempt sanctions. Indeed, they were not even given an opportunity to argue that such a hearing should be held. Instead, they were told that a hearing would be forthcoming only after the material had been turned over for in camera inspection. The majority's attempt to compensate for these procedural infirmities *295 by engaging in ad hoc factfinding is "too little, too late." It did not have to happen this way. This constitutional confrontation should have been avoided by granting a fair hearing to Farber and the New York Times under the guidelines mandated above. If the ultimate evidential test had been met by Dr. Jascalevich in accordance with those guidelines, Mr. Farber would have had to comply with the trial court order for in camera inspection. No one is above the law.
Since appellants were denied "an opportunity to be heard" prior to the imposition of sanctions against them, the judgments below must be vacated.
HANDLER, J., dissenting.
This appeal poses significant and novel issues the resolution of which will endure long after the underlying, highly publicized criminal case has become history. We are required on the appellate level to determine in the context of an ongoing criminal prosecution, now in its seventh month of continuous trial, whether judgments for contempt and the imposition of civil and punitive sanctions were properly visited upon a newspaper and its reporter for their refusal to obey subpoenas requiring that they turn over to the trial court for its in camera inspection information related to the case but generated in the course of news gathering and news publication. This Court now rules that the subpoenas duces tecum to produce the contested material for the trial judge's in camera inspection were enforceable and that the refusal of the reporter and the newspaper to comply with the trial court's compulsive turn-over order properly subjected them to civil and punitive sanctions for contempt, this notwithstanding their claim that they had no adequate opportunity to demonstrate the invalidity of the subpoenas and applicability of a newsman's privilege.
Because I am in substantial accord with much of the reasoning of the Court, it is with misgivings that I voice a dissent. I subscribe to the view that the newsman's privilege *296 is not predicated on the First Amendment and that under the New Jersey media privilege law, N.J.S.A. 2A:84A-21, it is not absolute and unqualified; the privilege must yield in appropriate circumstances to a defendant's constitutional right to material evidence in a criminal trial. Further, I agree generally that in camera inspection of private or confidential matter by a court may be necessary on a requisite showing in a given case to settle a legal tug of war for the information. I would, however, reach a different result and order a remand in this case in light of the inadequacy of the present record to justify the judgments of contempt. I would do so because of the strength of the newsman's privilege under the New Jersey shield law and the rigorous standards which ought to be applied in determining whether in camera inspection of contested information is appropriate in the face of a claim based on that privilege.

I
I agree with the Court that the appellants do not have a privilege founded upon the freedom of press clause of the First Amendment to the United States Constitution. The First Amendment does not stand as a bar to the issuance of a subpoena to a newsman to produce information material to the defense of a criminal case. The United States Supreme Court in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), effectively so decided:
* * * We are asked to create another [privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do. * * * On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions *297 put to them in the course of a valid grand jury investigation or criminal trial.
[408 U.S. at 690-691, 92 S.Ct. at 2661, 33 L.Ed.2d at 644-645; footnote omitted][*]
See also Houchins v. KQED, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); Zurcher v. Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179, reh. den. 382 U.S. 873, 86 S.Ct. 17, 15 L.Ed.2d 114 (1965); United States v. Liddy, 354 F. Supp. 208 (D.D.C. 1972); In re Bridge, 120 N.J. Super. 460 (App. Div.), certif. den. 62 N.J. 80 (1972), cert. den. 410 U.S. 991, 93 S.Ct. 1500, 36 L.Ed.2d 189 (1973); Annot., "Privilege of Newspaper or Magazine and Persons Connected Therewith Not to Disclose Communications to or Information Acquired by Such a Person", 7 A.L.R.3d 591 (1966).
It cannot be overemphasized that despite the absence in the First Amendment of any absolute privilege in favor of a newsman to resist claims for his information in the context of a criminal proceeding, the Amendment does embody constitutional values which are necessarily incidental to a free press in our democratic society. Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Branzburg v. Hayes, supra, 408 U.S. at 681, 92 S.Ct. at 2656, 33 L.Ed.2d at 639; New York Times Co. *298 v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed. 2d 822 (1971); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, reh. den. 389 U.S. 889, 88 S.Ct. 11, 13, 19 L.Ed.2d 197, 198 (1967); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); State v. Allen, 73 N.J. 132 (1977). Thus, while Justice White in Branzburg eschewed a balancing test to determine whether there was a privilege to refuse to disclose information (408 U.S. at 701-706, 92 S.Ct. at 2666-2669, 33 L.Ed.2d at 651-654), he nevertheless made it clear that the subject matter of the testimony and the relevancy of any material sought by a subpoena are legitimate questions to be raised and weighed:
Finally, as we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.
[408 U.S. at 707-708, 92 S.Ct. at 2670, 33 L.Ed.2d at 655; footnote omitted].
Justice Powell elaborated on that aspect of the majority decision in a concurring opinion:
As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the Court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper *299 balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.
[408 U.S. at 709-710, 92 S.Ct. at 2671, 33 L.Ed.2d at 656; footnote omitted].
It is, I believe, in necessary recognition of the First Amendment concern for the unfettered functioning of the news media in a free and democratic society that many courts have espoused the "balancing" approach articulated by Justice Powell. In Brown v. Commonwealth, 214 Va. 755, 204 S.E.2d 429 (Sup. Ct.), cert. den. 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974), the Virginia Supreme Court, relying on Branzburg, held that the reporter had a privilege "related to the First Amendment" to retain the confidentiality of his sources; since that privilege, however, was not a right guaranteed by the First Amendment it could be subordinated but
* * * only when the defendant's need is essential to a fair trial. Whether the need is essential to due process must be determined from the facts and circumstances in each case. We are of the opinion that when there are reasonable grounds to believe that information in the possession of a newsman is material to proof of any element of a criminal offense, or to proof of the defense asserted by the defendant, or to a reduction in the classification or gradation of the offense charged, or to a mitigation of the penalty attached, the defendant's need to acquire such information is essential to a fair trial; when such information is not otherwise available, the defendant has a due process right to compel disclosure of such information and the identity of the source; and any privilege of confidentiality claimed by the newsman must, upon pain of contempt, yield to that right.
[204 S.E.2d at 431].
See also Farr v. Pitchess, 522 F.2d 464 (9 Cir.1975), cert. den. 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976); State v. St. Peter, 132 Vt. 266, 315 A.2d 254 (Sup. Ct. 1974); cf. United States v. Liddy, supra.
*300 These decisions take Branzburg perhaps further than justified by a flat reading of either its majority or concurring opinion. They nevertheless show, as does Branzburg, that the reporter's conduct in obtaining and recounting news is a matter of constitutional consideration. A newsman's interest in the gathering of news is an indispensable component in its dissemination and a vital incident to freedom of the press. See State v. Allen, supra, 73 N.J. at 170-171 (Schreiber, J., concurring). Also New York Times Co. v. Sullivan, supra, 376 U.S. at 270, 84 S.Ct. at 720-721, 11 L.Ed.2d at 700-701; Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424-1425, 89 L.Ed. 2013, 2030 (1945); Id. 326 U.S. at 28-29, 65 S.Ct. at 1428-1429, 89 L.Ed. at 2034-2035 (Frankfurter, J., concurring); Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660, 668-669 (1936). See also Saxbe v. Washington Post, 417 U.S. 843, 862-863, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514, 526-527 (1974) (Powell, J., dissenting). That interest is therefore entitled to protection. In this perspective the reporter stands apart from the ordinary citizen, and although he is not thereby shed of the burdens of citizenship and must respond as any citizen to legal process, he should not needlessly be hobbled in the pursuit and presentation of news. Constraints upon the news media should therefore be tolerated only when they are essential in the good faith discharge of legitimate governmental objectives, or when clearly required for the vindication of individual constitutional rights. We are here confronted with such a case and it is in this framework that the fundamental, contending claims of the principals should be assessed.

II
The Supreme Court in Branzburg made it clear that states have complete freedom of action "within First Amendment limits, to fashion their own standards ... as to a ... newsman's *301 privilege, either qualified or absolute." 408 U.S. at 706, 92 S.Ct. at 2669, 33 L.Ed.2d at 654.
Appellants contend vigorously that the New Jersey Legislature by enacting L. 1977, c. 253 fashioned an absolute privilege and thereby obviated any requirement for balancing or weighing its application against a claim for material information even in a criminal proceeding. In advancing this argument, appellants build upon the Attorney General's assertion that the present statutory privilege reflects "a purposeful legislative intention and State policy to go beyond the requirements of the Federal and State Constitutions * * * and to protect the press and representatives thereof from any disclosure, even to the court * * *." They conclude that the "law itself strikes the balance in favor of a privilege, in all non-waived situations, for a journalist `to refuse to disclose * * * to (sic: in) any court' [N.J.S.A. 2A:84A-21; Evid. R. 27] his sources or information."
While the statutory language by its literal, facial terms appends no qualifications to the privilege for newsmen to withhold information, it is difficult to attribute to the Legislature an intent to create an absolute privilege. When enacted it was thoroughly established in this jurisdiction that statutory privileges obstruct truth and ought to be construed restrictively, In re Selser, 15 N.J. 393, 405-407 (1954); also State v. Jamison, 64 N.J. 363, 375 (1974); In re Richardson, 31 N.J. 391, 396-397 (1960); Hansen v. Janitschek, 31 N.J. 545 (1960) rev'g on dissenting opinion of Conford, J.A.D., 57 N.J. Super. 418, 433 (App. Div. 1959); L.J. v. J.B., 150 N.J. Super. 373, 378-380 (App. Div. 1971); Metalsalts Corp v. Weiss, 76 N.J. Super. 291, 297 (Ch. Div. 1962), and "in sensible accommodation to the aim of a just result", State v. Briley, 53 N.J. 498, 506 (1969); In re Murtha, 115 N.J. Super. 380, 385-386 (App. Div. 1971); State v. Roma, 140 N.J. Super. 582, 589 (Law Div.), 143 N.J. Super. 504 (Law Div. 1976) (supplemental opinion); see D. v. D., 108 N.J. Super. 149 (Ch. Div. 1969). It was also axiomatic in our law that no claimant of a privilege can *302 be the final judge of his own claim, a rule recognized in innumerable contexts. In re Addonizio, 53 N.J. 107, 116-117 (1968); In re Boyd, 36 N.J. 285, 286-287 (1962); In re Boiardo, 34 N.J. 599, 602 (1961); State v. DeCola, 33 N.J. 335, 350 (1960); In re Selser, supra, 15 N.J. at 404-405; State v. Toscano, 13 N.J. 418, 423 (1953); In re Pillo, 11 N.J. 8, 19-20 (1952); In re Ippolito, 145 N.J. Super. 262, 266-267 (App. Div. 1976); Zucker v. Silverstein, 134 N.J. Super. 39, 53 (App. Div. 1975); State v. Craig, 107 N.J. Super. 196, 198-199 (App. Div. 1969). Moreover, restrictive evidentiary rules ordinarily must yield to the fundamental rights of a defendant to call and confront witnesses, such as invoked in this very case. See Davis v. Alaska, 415 U.S. 308, 315-320, 94 S.Ct. 1105, 1110-1112, 39 L.Ed.2d 347, 353-356 (1974); Chambers v. Mississippi, 410 U.S. 284, 294-302, 93 S.Ct. 1038, 1045-1049, 35 L.Ed.2d 297, 308-313 (1973); Washington v. Texas, 388 U.S. 14, 17-19, 87 S.Ct. 1920, 1922-1923, 18 L.Ed.2d 1019, 1022-1023 (1967); Roviaro v. United States, 353 U.S. 53, 60-61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639, 645 (1957); State v. Briley, supra; State v. Roma, supra, 140 N.J. Super. at 587-592.
I can therefore agree with the Court that the privilege under the New Jersey shield law is not absolute. It would be a mistake, however, to impute to the Legislature an intent in creating the privilege to furnish only middling protection for the confidentiality of the newsman's work. Rather it seems clear that short of making the privilege absolute, the Legislature sought to establish the strongest possible protection for the newsman and the news media. This is evinced not only by the clear and direct terms of the statute, N.J.S.A. 2A:84A-21, which the Court has noted is one of the most strongly expressed in the country. It is demonstrated by the legislative and judicial evolution of the privilege. That has been a history starting at a point when there was no privilege at all, In re Grunow, 84 N.J.L. 235 (Sup. Ct. 1913), through sequential legislation creating and expanding *303 the protection afforded the news media and the newsman. Compare L. 1933, c. 167 (protecting "source" of any information) with L. 1960, c. 52, § 21 (protecting "source, author, means, agency or person from * * * whom information * * * was procured * * *") and L. 1977, c. 253, N.J.S.A. 2A:84A-21 (protecting "any news or information obtained in the course of [a reporter's] professional activities whether or not it is disseminated"). The most recent amendment, the current shield law, L. 1977, c. 253, was a direct answer to In re Bridge, supra, and Branzburg, which allowed grand jury access to a reporter's material, revealing a purpose on the part of the Legislature to accord the broadest protection for the news media and reporters.
This legislative and judicial course highlights the significant public policy embodied in the statutory newspapermen's privilege. It seems to me that the majority of this Court does not give full weight to this public policy and, perhaps for that reason, minimizes the serious impact which an in camera inspection, with all its protective accoutrements, has upon the newsman's privilege.
Even though courts have approved the use of in camera inspection when a claim of privilege is asserted, at best it is a temporizing solution borne of a paradox  the need to see evidence in order to determine whether the evidence can be seen. The dilemma was aptly perceived by Justice Brennan (then of this Court) in In re Pillo, supra 11 N.J. at 20, drawing from Judge Learned Hand in United States v. Weisman, 111 F.2d 260, 262 (2 Cir.1940): "The only practicable solution is to be content with the door's being set a little ajar, and while at times this no doubt partially destroys the privilege, and at times it permits suppression of competent evidence, nothing better is available." Also United States v. Melchor Moreno, 536 F.2d 1042 (5 Cir.1976); In re U.S. Hoffman Can Corp., 373 F.2d 622 (3 Cir.1967). It must be stressed nevertheless that the in camera inspection is in fact an incursion into confidentiality. Cf. State v. *304 Milligan, 71 N.J. 373, 393 n. 12 (1976); State v. Oliver, 50 N.J. 39 (1967). We cannot assume that such a loss of confidentiality, even at the hands of judges, does not obtrude upon the freedom of the press which the privilege is designed to secure. New York Times Co. v. Jascalevich, ___ U.S. ___, 99 S.Ct. 11, 58 L.Ed.2d 38 (July 12, 1978, Marshall, J., denying reapplication for stay); see Murasky, "The Journalist's Privilege: Branzburg and Its Aftermath", 52 Tex. L. Rev. 820, 857-866 (1974).
While the assertion of privilege may not defeat a need for evidence, at least for an in camera inspection, and especially when requested to satisfy a defendant's constitutional right in a criminal trial, the presence of the privilege adds measurably to the difficulty in justifying such disclosure. Cf. United States v. Marshall, 377 F. Supp. 1326, aff'd sub nom. United States v. Mitchell, 377 F. Supp. 1326, aff'd sub nom. L.Ed.2d 1039 (1974); also Nixon v. Administrator of General Services, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1977). Since the in camera inspection itself "partially destroys the privilege"  and the privilege in this case is deserving of the strongest support  the standards for permitting even so limited a breach of confidentiality should be exacting. Certain initial or threshold showings of need must be required and the burden of convincing the court that such need exists should be a substantial one. Thus an in camera inspection of a newspaperman's work or work product ought not be allowed unless a defendant has demonstrated in convincing fashion that (1) such information probably contains evidence relevant and material to the question of guilt; (2) in the context of the criminal trial such information appears necessary in the search for truth; and (3) there are no other feasible alternative sources or less intrusive means by which the same evidence can be procured. Additionally, it should be shown that the request for information is not overbroad, oppressive or unreasonable. These criteria overlap those generally applicable *305 to the issuance and enforcement of subpoenas even in the absence of a claim of privilege. R. 1:9-2; e.g., State v. Cooper, 2 N.J. 540 (1949); cf. Schlossberg v. Jersey City Sewerage Authority, 15 N.J. 360 (1954); Wasserstein v. Swern and Co., 84 N.J. Super. 1, 6-7 (App. Div. 1964); State v. Asherman, 91 N.J. Super. 159, 162 (Cty. Ct. 1966). The existence of the privilege, however, enhances the quality of proofs required for the production of evidence. Where the claims for subpoenaed materials implicate privileged interests, and the privilege invoked is of singular importance, as here, the court's insistence upon the requisite showing of need should be unyielding and meticulous. Cf. United States v. Nixon, supra, 418 U.S. at 697-702, 94 S.Ct. at 3102-3105, 41 L.Ed.2d at 1058-1061.

III
In applying these principles to this case, we are confronted with certain disabling limitations not of our making. In our appellate review of the contempt judgments on an accelerated basis we have not been made privy to the total record or even a substantial part thereof. In view of the conclusory expression of the trial court judge in justification of his June 30 order for in camera inspection and the absence of any findings or exposition of his reasoning, I do not believe we are in a position to assess the validity of the order or to consider the reasonableness of appellants' refusal to obey that order.
It is argued by defendant that there is a record basis for the judge's conclusion that it would be "impossible" to weigh appellants' substantive claims without an in camera inspection of the subpoenaed material. The majority has adopted defendant's rendition of the record to show that there are several instances where appellant Farber is likely to have relevant and necessary information. Unfortunately we do not have the slightest hint that the trial judge contemplated these examples in reaching his ultimate conclusion or in what *306 way he might have considered that information to be relevant and necessary. Rather it appears so far that the basis for the court's order for in camera inspection was the same advanced for the initial and second certificates of materiality issued by the trial judge. These certificates disclose some likelihood that some material sought is somewhat relevant; they yield only a bare conclusion as to its necessity, are silent as to alternative sources and are indifferent to matters of overbreadth, oppressiveness and unreasonableness. The determination of the New York court as to the adequacy of the initial certificate of materiality, which resulted in the issuance of the subpoenas, though buttressed by a hearing as required under the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings (N.J.S.A. 2A:81-18 et seq.); N.Y. Crim. Proc. L. § 640.10 (McKinney 1971), was not based on matters of record which appreciably augmented that furnished in connection with the certificate of materiality. Moreover, it was assumed by the New York court that appellants would be given a further opportunity to demonstrate on grounds of reasonableness and privilege that the subpoenas should not be enforced.
It may be that the ultimate conclusion of the trial judge as to the necessity for in camera inspection is sound and can be supported by the record. But for us to so rule on hypothetical findings extrapolated from only a small part of a huge record would be a flight of fancy. This is not a proper case for the exercise of original jurisdiction. R. 2:10-5. This is peculiarly so in view of the high order of the proofs which I consider requisite to establish the threshold requirements of relevance, necessity and the absence of alternatives. In light of the gravity of the issues and the complexity of the record, only a tip of which has been exposed to us, it should be the obligation and province of the trial judge to explain to the litigants, and the appellate court, why he has ordered an in camera inspection of confidential matter. Cf. United States v. Nixon, supra.
*307 A party whose claim of a strong statutory privilege has been thus overborne and who has been visited with a compulsory turnover order which constitutes a real invasion of confidentiality, and has been adjudicated guilty of the crime of contempt and subjected to onerous civil as well as punitive sanctions, is entitled to redress. The proper solution, I feel, would be a remand to complete the record. This can be done by the trial judge making findings in support of his conclusion that an in camera inspection of the subpoenaed evidence is now necessary as a prelude to further proceedings in the criminal trial. This will enable us to determine whether the requisite showing has been made with respect to the threshold issues and to accord appellants the judicial review to which they are entitled. Since it appears that the judge is thoroughly immersed in the case and conversant with all of its facets and that the parties have had numerous opportunities to impress upon the trial court their positions with respect to the materials sought, a further hearing at this juncture is not required as a matter of fair procedure or due process. Because the issues engage so completely the knowledge and discretion of the trial judge, however, he should not be precluded from permitting the parties to supplement the record by affidavit or limited testimony if this appears desirable or necessary. In view of the exigencies of the trial, this course is not mandated. These same exigencies reasonably dictate that this Court should retain justification of this proceeding and direct that the trial judge submit his findings within a few days.
Under these circumstances, the judgments of contempt should be vacated. Criminal contempt proceedings are attended with virtually the same solemnity as ordinary criminal actions. N.J. Dept. of Health v. Roselle, 34 N.J. 331 (1961); In re Buehrer, 50 N.J. 501 (1967). These include notice of the essential elements of the charges and a reasonable opportunity to challenge their sufficiency. In re Tiene, 17 N.J. 170 (1954). The appellants did not have an adequate opportunity to confront the merits of the enforcement *308 order of June 30, 1978, which constitutes the basis of the contempt proceedings. In the absence of any disclosure by the trial judge as to his specific reasons compelling the in camera inspection, there was no viable chance for appellants to defend against the order to enforce on the grounds of privilege and the invalidity of the subpoenas. Since the hearings in both contempt proceedings, that in aid of a litigant as well as the criminal action, were substantially merged, the vice of inadequate notice and opportunity to challenge infects each. I would therefore vacate both contempt judgments.
For affirmance  Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER  5.
For reversal  Justices PASHMAN and HANDLER  2.
NOTES
[1] The First Amendment of the United States Constitution reads as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
[2] The term "shield law" is commonly and widely applied to statutes granting newsmen and other media representatives the privilege of declining to reveal confidential sources of information. The New Jersey shield law reads as follows:

Subject to Rule 37, a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere:
a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
The provisions of this rule insofar as it relates to radio or television stations shall not apply unless the radio or television station maintains and keeps open for inspection, for a period of at least 1 year from the date of an actual broadcast or telecast, an exact recording, transcription, kinescopic film or certified written transcript of the actual broadcast or telecast.
* * * * * * * *
Unless a different meaning clearly appears from the context of this act, as used in this act:
a. "News media" means newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public.
b. "News" means any written, oral or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect.
c. "Newspaper" means a paper that is printed and distributed ordinarily not less frequently than once a week and that contains news, articles of opinion, editorials, features, advertising, or other matter regarded as of current interest, has a paid circulation and has been entered at a United States post office as second class matter.
d. "Magazine" means a publication containing news which is published and distributed periodically, has a paid circulation and has been entered at a United States post office as second class matter.
e. "News agency" means a commercial organization that collects and supplies news to subscribing newspapers, magazines, periodicals and news broadcasters.
f. "Press association" means an association of newspapers or magazines formed to gather and distribute news to its members.
g. "Wire service" means a news agency that sends out syndicated news copy by wire to subscribing newspapers, magazines, periodicals or news broadcasters.
h. "In the course of pursuing his professional activities" means any situation, including a social gathering, in which a reporter obtains information for the purpose of disseminating it to the public, but does not include any situation in which a reporter intentionally conceals from the source the fact that he is a reporter, and does not include any situation in which a reporter is an eyewitness to, or participant in, any act involving physical violence or property damage. [N.J.S.A. 2A:84A-21 and 21a]
[3] The Sixth Amendment of the United States Constitution reads as follows:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.
[4] Article 1, ¶ 10 of the Constitution of the State of New Jersey reads as follows:

In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel in his defense.
[5] Compare the informer's privilege where disclosure of identity may sometimes be required. State v. Milligan, 71 N.J. 373 (1976); State v. Oliver, 50 N.J. 39 (1967); Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed. 639 (1957).
[1] Counsel for Jascalevich intimates that a reporter who informs the public by authoring a book is somehow less deserving of Shield Law protection than one who articulates his findings in a newspaper. Publishing journalistic books for money is no less an illustrious way to perform the function of the press than is writing newspaper articles for a salary.
[*] This holding was underscored by Justice White, the author of the majority opinion in Branzburg, who stated in the course of this litigation on an application for a stay of the order for civil sanctions:

There is no present authority in this Court either that newsmen are constitutionally privileged to withhold duly subpoenaed documents material to the prosecution or defense of a criminal case or that a defendant seeking the subpoena must show extraordinary circumstances before enforcement against newsmen will be had. (Citations omitted) [New York Times Co. v. Jascalevich, ___ U.S. ___, 99 S.Ct. 6, 10, 58 L.Ed.2d 25 (1978)].